[Crim. No. 10123. First Dist., Div. One. Dec. 28, 1971.]

In re PAUL J. BONGFELDT on Habeas Corpus.

## Counsel

Walcom & Harmon and John T. Harmon for Petitioner.

No appearance for Respondent.

Fletcher, Smith & Lasky and Henry B. Lasky as Amici Curiae on behalf of Respondent.

## Opinion

**ELKINGTON, J.**—Following a hearing the superior court found petitioner Paul Bongfeldt to be in contempt and ordered that he be committed to the county jail "until such time as [he] complies with the order of this court by answering questions refused at [his] deposition." By petition for writ of habeas corpus he seeks to nullify the superior court's order. Pending our decision we ordered execution of the commitment stayed.

The proceedings have their origin in an action commenced by one Samuel Armstrong against Allstate Insurance Company. The pertinent allegations of the complaint are summarized in the following paragraph.

Plaintiff Samuel Armstrong was the insured under an automobile liability policy in which Allstate agreed to pay all sums that he "shall be legally entitled to recover" as damages arising out of a collision between the insured vehicle and "an uninsured automobile." The limit of liability was $15,000 for each person injured. On failure of Allstate and the insured to agree on such damages the policy provided for arbitration.[1] On July 5,

---

[1]The pertinent policy provision follows: "The Company will pay all sums which the insured or its legal representative shall be legally entitled to recover as damages from the owner or operator of an uninsured automobile because of bodily injury, sickness or disease, including death resulting therefrom, hereinafter called 'bodily injury' sustained by the insured, caused by accident and arising out of the ownership,

1969, Armstrong's 58-year-old wife Beulah while driving the automobile without fault on her part, was struck by a negligent uninsured motorist, proximately resulting in her death. Allstate conceded liability to Armstrong under the policy; the only disputed issue was that of damages. Armstrong was legally entitled to recover as such damages the limit of the policy, $15,000, which amount was demanded by him. He and the company, however, failed to agree on the damages forcing the matter into arbitration. The arbitrator thereafter awarded Armstrong $15,000, the amount previously demanded and the policy's limit. Armstrong alleged that in writing the policy Allstate had fraudulently failed to disclose that it "never intended to pay a sum equal to its policy limit in settlement" even though said person or persons were "legally entitled to recover" said policy limits, but instead "had a fixed and firm policy of contesting all uninsured motorist claims where it could not negotiate a settlement for a sum of money which was less than said policy limits." Relying on Allstate's promise to pay all sums that he shall be legally entitled to recover, Armstrong purchased the policy, to his loss and detriment. Further, Allstate negotiated settlement with Armstrong in bad faith. The described conduct of Allstate caused Armstrong to incur attorney fees of $2,000 and other expenses, and to suffer loss of use of the $15,000 to which he was entitled as well as emotional and mental distress. For all of this Armstrong sought damages.

Allstate's answer, in part a general denial, affirmatively alleged among other things, (1) that Armstrong "was not legally entitled to any sum whatsoever absent agreement between the plaintiff and defendant, until after award in arbitration"—and further, (2) that "it was privileged under the law and pursuant to the terms and provisions of the contract of insurance, to have determined by arbitration the amount of damages to which plaintiff was legally entitled."

At least one of the issues raised in the action was whether Allstate had exercised the good faith toward its insured, Armstrong, which is demanded by law. This duty is well expressed in *Crisci* v. *Security Ins. Co.*, 66 Cal.2d 425, 429-430 [58 Cal.Rptr. 13, 426 P.2d 173], as follows: "In determining whether an insurer has given consideration to the interests of the insured, the test is whether a prudent insurer without policy limits would have accepted the settlement offer. [Citations.] [¶] Several cases, in considering the liability of the insurer, contain language to the effect that

---

maintenance or use of such uninsured automobile, provided, for the purposes of this endorsement, determination as to whether the insured or such representative is legally entitled to recover such damages, and if so, the amount thereof, shall be made by agreement between the insured or such representative and the Company, or, if they fail to agree, by arbitration."

bad faith is the equivalent of dishonesty, fraud, and concealment. (See *Critz* v. *Farmers Ins. Group, supra,* 230 Cal.App.2d 788, 796 [41 Cal. Rptr. 401]; *Palmer* v. *Financial Indem. Co.,* 215 Cal.App.2d 419, 429 [30 Cal.Rptr. 204]; *Davy* v. *Public National Ins. Co., supra,* 181 Cal. App.2d 387, 396 [5 Cal.Rptr. 488].) Obviously a showing that the insurer has been guilty of actual dishonesty, fraud, or concealment is relevant to the determination whether it has given consideration to the insured's interest in considering a settlement offer within the policy limits. The language used in the cases, however, should not be understood as meaning that in the absence of evidence establishing actual dishonesty, fraud, or concealment no recovery may be had for a judgment in excess of the policy limits. *Comunale* v. *Traders & General Ins. Co., supra,* 50 Cal.2d 654, 658-659 [328 P.2d 198], makes it clear that liability based on an implied covenant exists whenever the insurer refuses to settle in an appropriate case and that liability may exist when the insurer unwarrantedly refuses an offered settlement where the most reasonable manner of disposing of the claim is by accepting the settlement. Liability is imposed not for a bad faith breach of the contract but for failure to meet the duty to accept reasonable settlements, a duty included within the implied covenant of good faith and fair dealing. Moreover, examination of the balance of the *Palmer, Critz,* and *Davy* opinions makes it abundantly clear that recovery may be based on unwarranted rejection of a reasonable settlement offer and that the absence of evidence, circumstantial or direct, showing actual dishonesty, fraud, or concealment is not fatal to the cause of action."

Petitioner Paul Bongfeldt was an evaluator of claims employed by Allstate Insurance Company. At a deposition on June 30, 1971, he was asked the following questions by Armstrong's attorney, Mr. Lasky:

"Q. Based upon your experience, Mr. Bongfeldt, assuming a wrongful death claim under the uninsured motorist provisions of the Allstate policy wherein there is no question about coverage—that the coverage applies, okay?

"A. Okay.

"Q. And assuming that it is clear liability in the sense that the wrongful death was proximately caused by a negligent uninsured motorist; and assuming that there was no contributory negligence on the part of the deceased; in other words, assuming everything regarding coverage and liability was without question indicating that there was coverage and there is liability and it is just a question of damages; and assuming that the deceased in this wrongful death case was a fifty-eight year old Negro

woman employed as a domestic earning a gross of approximately $40 a week; and further assuming that she has no children and is survived by a sixty-one year old Negro husband; and further assuming that they have been married for approximately thirty years; and assuming that there was approximately a thousand dollars in funereal expenses for the burial of the decedent; and assuming that she was in perfectly good health preceding her death as a result of this auto accident; and further assuming that the surviving husband is in good health, are you able to make, based upon those assumed facts, an evaluation of the wrongful death claim under the $15,000 uninsured motorist provisions of the policy?"

There followed this discussion:

"MR. HARMON: I will object to the form of the question. You don't have to answer the question.

"MR. LASKY: Q. Are there any facts which you would need to evaluate such a claim which have not been given to you?

"MR. HARMON: That calls for his opinion and conclusion.

"MR. LASKY: I am asking him for his opinion.

"MR. HARMON: He doesn't have to make up the question for you.

"MR. LASKY: I am asking his opinion, Mr. Harmon.

"MR. HARMON: I will object to the question.

"MR. LASKY: Are you instructing him not to answer?

"MR. HARMON: Yes. He doesn't have to ask the questions for you, Henry, he only has to answer proper ones.

"MR. LASKY: I think that is a perfectly proper question. Q. Mr. Bongfeldt, I hand you the copies of the Allstate Insurance Company file in connection with the claim of Samuel Armstrong for the wrongful death of his wife. Mr. Harmon provided me with all these documents.

"MR. HARMON: What do you want him to do with this?

"MR. LASKY: Q. I would like, Mr. Bongfeldt, if you can just review that file and give your evaluation.

"MR. HARMON: I will object to the form of the question. That's not the entire file, counsel. He is not going to look at a collection of papers selected by you and then give some evaluation.

"MR. LASKY: That is not the entire file?

"MR. HARMON: That's just the portion that you took.

"MR. LASKY: I took all the portions of the file in connection with Mr. Armstrong's claim.

"MR. HARMON: I'm not going to argue with you, but he is not going to answer the question."

Later in the deposition Mr. Lasky caused the reporter to read the previously asked hypothetical question. The following then ensued.

"MR. LASKY: Q. Mr. Bongfeldt, you have heard the reporter read from the record all of the factors which I asked you to assume regarding the hypothetical wrongful death claim, okay? A. Right.

"Q. Based upon the facts which have been given to you and which you have been asked to assume, for settlement purposes what amount of money would you evaluate as top authority for settlement of such a claim?

"MR. HARMON: I will object to the form of the question.

"MR. LASKY: I would like the question read back. (The last question was read by the reporter.)

"MR. LASKY: Are you instructing him not to answer?

"MR. HARMON: Yes."

Thereafter the superior court on August 23, 1971, made an entered the following order:

"IT IS HEREBY ORDERED that PAUL J. BONGFELDT appear before a Notary Public and court reporter at 1736 Franklin Street, Oakland, California, on 10th day of Sept., 1971, at 10:00 a.m. or at such other time as may be agreed upon by the parties herein and then and there to enter all those questions which he refused to answer at the taking of his deposition on June 30, 1971, and any and all other questions relevant to the subject matter of those questions and of the pending action;

"IT IS FURTHER ORDERED that PAUL BONGFELDT and his attorney, JOHN HARMON, advising the refusal, pay to HENRY B. LASKY the amount of his reasonable expenses, including reasonable attorneys fees incurred in obtaining this order in the sum of $250.00."

The deposition was resumed on September 10, 1971. The contested hypothetical question was again asked, terminating, as previously indicated, with "[A]re you able to make, based upon those assumed facts, an evaluation of the wrongful death claim under the $15,000 uninsured motorist provisions of the policy?"

Bongfeldt answered "No," after which the following occurred:

"Q. Why not? A. I'm without the information which I would require to be making any sort of decision on that type of a file.

"Q. What information would you require?

"A. I would require, if I were making this type of decision, what to pay or if to pay, my complete claim file, including all my investigation or an adjuster's investigation period.

"Q. What facts in that complete claim file that you have referred to would you need which has not been assumed in my question that would be critical or determinative in making your evaluation?

"A. I have made it my practice not to make evaluations or decisions by assumption, but only with concrete facts which I have in front of me through a full investigation of a file.

"Q. As an evaluator for Allstate Insurance Company, however, you have had access to the entire Allstate Insurance Company file regarding the wrongful death claim of Beulah Armstrong; isn't that correct? A. That is not correct.

"Q. On June 30th, 1971, when this deposition started, Mr. Bongfeldt, you testified, I believe, that you reviewed the accommodation file— . . .

"THE WITNESS: I reviewed a file which we had in the office on Samuel Armstrong.

"MR. LASKY: Q. From your review of that file and the hypothetical question which I have asked you, can you make an evaluation? A. No.

"Q. Why not. A. The file which I would have looked through is nothing other than the complaint of Armstrong versus Allstate. There was no material relative to the accident which took place in New Mexico; no material relative to any injuries sustained, bills, et cetera.

"Q. So, the materials that you are interested in are the materials relevant to the accident, is that correct?

"A. Correct.

"Q. And the materials relevant to the injuries sustained, is that correct? A. Correct. . . .

"MR. LASKY: Q. What other materials would you look for in a file which would give you information which you need to evaluate a case other than materials relative to the accident and materials relative to the injuries?

"MR. HARMON: I think he has already testified in response to your question that he would review his entire file in order to make the evaluation, and he hasn't done that.

"MR. LASKY: Q. And the review of that entire file is because you are interested in seeing materials relative to the accident? A. I don't quite understand your question.

"Q. I am trying to be fully fair about this, Mr. Bongfeldt. What facts would you look for in a review of a file which you would need to evaluate a wrongful death claim?

"MR. HARMON: I think that would call for mere speculation on his part, because until such time as a file is reviewed, who knows what is going to be in it, and one would review it for everything in it.

"MR. LASKY: Mr. Harmon, you know as well as I that in my question we assumed clear liability—

"MR. HARMON: I know what your question said.

"MR. LASKY: —we assumed the death, and the only question was an evaluation as to the damages.

"MR. HARMON: I know what the question was.

"MR. LASKY: We assumed all specials.

"Q. Are there any other factors which you would need in order to evaluate the claim, Mr. Bongfeldt?'

"A. Because we are dealing with a hypothetical, I'd still need the file.

"MR. LASKY: Mr. Harmon, you have the entire Armstrong file, because you were kind enough to let me review it. Why don't we take a recess and let Mr. Bongfeldt review the file?

"MR. HARMON: No.

"MR. LASKY: All right. Then why don't we reset the deposition to another date and allow Mr. Bongfeldt to review the entire Armstrong versus Allstate file which is available to him?

"MR. HARMON: No.

"MR. LASKY: In other words, you refuse to do that?

"MR. HARMON: Sure. He doesn't have to do that.

"MR. LASKY: Q. Mr. Bongfeldt, would two weeks be adequate time for you to review the entire Armstrong versus Allstate file? A. I would say so.

"Q. Are you willing to have this deposition continued for two weeks in order to allow you to do that so you can answer the question?

"MR. HARMON: You don't have to do that. You don't have to answer that. That has nothing to do with anything."

Thereafter, following further proceedings, the superior court found Bongfeldt to be in contempt of court. He was, as previously indicated, remanded to the county jail "until such time as he answers questions refused at the deposition."

■ On review of a judgment of contempt the basic question before the appellate court is whether the trial court had jurisdiction to render the judgment under review. (*Crosswhite* v. *Municipal Court,* 260 Cal. App.2d 428, 431 [67 Cal.Rptr. 216]; *In re Chapman,* 141 Cal.App.2d 387, 389-390 [295 P.2d 573]; *In re Lake,* 65 Cal.App. 420, 424 [224 P. 126].) The determination of this question ordinarily as here, depends on whether or not substantial evidence supported the trial court's decision; if there was such substantial evidence the contempt judgment must stand. (*City of Vernon* v. *Superior Court,* 38 Cal.2d 509, 517 [241 P.2d 243]; *Bridges* v. *Superior Court,* 14 Cal.2d 464, 485 [94 P.2d 983].) For a statement of the substantial evidence rule see *People* v. *Mosher,* 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659]; and *Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.,* 66 Cal.2d 782, 784-785 [59 Cal. Rptr. 141, 427 P.2d 805].

■ Although perhaps contradicted in part, the following evidence which must be deemed substantial was before the court at the contempt hearing: Armstrong's claim was handled by Allstate in the Oakland area. Since Mrs. Armstrong's death Bongfeldt had been the company's only evaluator of claims in that area. "Of all the people at the Allstate Insurance Company office at Oakland [he was] the person responsible for the evaluation of claims." In his "capacity as evaluator for the purpose of placing settlement authority on file [he reviewed] the information which the adjustors have gathered in connection with the handling of a claim." He had "reviewed a file which we had in the office on Samuel Armstrong," and he had previously discussed the case with an Allstate adjustor, Palmer Hatch, who had offered $5,000 in settlement to Armstrong. After reviewing the Armstrong file a day before the deposition's first session he dropped it off at the office of Allstate's attorney, John Harmon. At the deposition Mr. Lasky stated that Mr. Harmon had allowed him to see the "entire Armstrong file"; this statement went undenied both at the deposition and at the contempt hearing. Allstate's file contained a statement of Armstrong's expenses in an amount exceeding $2,000, resulting from his wife's death.

It is the public policy of California that litigants be liberally afforded discovery to the end that justice be dispensed fairly and speedily. (See *Pacific Tel. & Tel. Co.* v. *Superior Court,* 2 Cal.3d 161, 171-173 [84 Cal. Rptr. 718, 465 P.2d 854]; *Greyhound Corp.* v. *Superior Court,* 56 Cal.2d 355, 375-378 [15 Cal.Rptr. 90, 364 P.2d 266].) It was said in *Greyhound Corp.* v. *Superior Court, supra* (p. 376), ". . . that the Legislature intended to take the 'game' element out of trial preparation while yet retaining the adversary nature of the trial itself. One of the principal purposes of discovery was to do away 'with the sporting theory of litigation—namely, surprise at the trial.' (*Chronicle Pub. Co.* v. *Superior Court, supra,* 54 Cal.2d 548, 561 [7 Cal.Rptr. 109, 354 P.2d 637]. See also page 572 of the same opinion wherein we adopted from *United States* v. *Proctor & Gamble Co.,* 356 U.S. 677 [2 L.Ed.2d 1077, 78 S.Ct. 983], the phrase that discovery tends to 'make a trial less a game of blindman's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.') . . ."

And it has been said that the power of a judge in contempt proceedings is not designed to protect his own dignity and person, but rather to protect the rights of litigants and the public by insuring that the administration of justice shall not be thwarted or obstructed. (See Report and Recommendations on Disruption of the Judicial Process, American College of Trial Lawyers, July 1970.)

Adverting directly to the issue now before us, it is observed that the court ordered Bongfeldt to answer the contested hypothetical question, *"and any and all other questions relevant to the subject matter of those questions, and of the pending action."* (Italics added.) And obviously such matters as Allstate's evaluation of Armstrong's claim was relevant to the issues of his action.

Returning to his deposition, and upon being asked the question he had been specifically ordered to answer, Bongfeldt replied that he could not and would not answer, since "I have made it my practice not to make evaluations or decisions by assumption." This was clearly a violation of the trial court's order.

Bongfeldt was then asked if, from his review of the file and the hypothetical question, he could make such an evaluation. He answered "No," since the file was not complete (contrary to other evidence), lacking "material relevant to the accident" (irrelevant, since liability for Mrs. Armstrong's wrongful death had been conceded) and Armstrong's "bills" (which were in fact in the file). The trial court could reasonably have concluded that this also was a violation of its order.

Bongfeldt indicated that he would have to "review his entire file in order to make the evaluation." Armstrong's attorney suggested a recess to "let Mr. Bongfeldt review the file." Mr. Harmon responded "No," and Bongfeldt did not review the file to make his evaluation. Later Bongfeldt stated that two weeks would be adequate time to review the entire Armstrong file. Asked if he (Bongfeldt) was "willing to have this deposition continued for two weeks in order to allow you to do that so you can answer the question?", Mr. Harmon responded, "You don't have to do that. You don't have to answer that. That has nothing to do with anything." Bongfeldt complied with his attorney's wishes; he did not answer, and the deposition was not continued for his review of the file. Here also were violations of the trial court's order to answer questions relating to the evaluation of Armstrong's claim.

It thus appears that Bongfeldt, violating orders of the trial court made within its jurisdiction, was properly found guilty of contempt.

The suggestion that since Bongfeldt apparently acted on advice of counsel he is somehow excused from what would otherwise be contempt, is without merit. ■ " '[O]ne cannot justify disobedience of an order of the court upon the ground that it was based upon the advice of counsel; . . .' " (*City of Vernon* v. *Superior Court, supra,* 38 Cal.2d 509, 518.)

Nor can it reasonably be contended that the witness Bongfeldt was unable to answer certain of the questions since Allstate's attorney held the Armstrong file. Bongfeldt was an officer, or at least a high level employee, of the attorney's client Allstate. He himself had delivered the file to the attorney. It is inconceivable that upon demand the attorney would not return the file to Bongfeldt for his inspection.

The whole record discloses a high-handed oppressive effort on the part of Bongfeldt and Allstate's attorney to defy the order of the trial court, to deny Armstrong the discovery to which he was entitled, and to defeat the strong policy of the law. The trial court found Bongfeldt alone to be in contempt. In our view, were the contempt of each to be weighed, that of the attorney would be the greater. In such cases courts should not hesitate also to impose contempt sanctions upon the errant attorney. "Although an attorney is not technically a party, he too is already before the court; . . . the statute [here Code Civ. Proc., § 2034, subd. (a) q.v.] provides that sanctions may also be imposed against him without a precedent motion and order." (*Weinkauf* v. *Superior Court,* 64 Cal.2d 662, 665 [51 Cal. Rptr. 100, 414 P.2d 36].)

■ Complaint is made by Bongfeldt of imperfections leading to his contempt commitment and of shortcomings of the written order of commit-

ment. No objection to the sufficiency of the proceedings was made in the superior court (see Code Civ. Proc., § 1211.5, subd. (a)), and we find the order of commitment to be legally sufficient. In any event, we are of the opinion (in the language of Code Civ. Proc., § 1211.5) after an examination of the entire cause, including the evidence, that the error complained of has not resulted in a miscarriage of justice.

No merit is found in Bongfeldt's contention that since the court did not orally order payment of attorney fees to Armstrong's attorney, its written order of August 23, 1971, to that effect is somehow invalid; furthermore, that order is in no way related to the instant habeas corpus application and is therefore not properly before us. ▪ And despite his contention to the contrary we find that the hypothetical question was relevant to the "subject matter of the action." (See *Pacific Tel. & Tel. Co.* v. *Superior Court, supra,* 2 Cal.3d 161, 171-174.)

The application for a writ of habeas corpus is denied; the stay of execution of the superior court's order is set aside.

Molinari, P. J., and Sims, J., concurred.

A petition for a rehearing was denied January 26, 1972, and petitioner's application for a hearing by the Supreme Court was denied February 23, 1972.