[Civ. No. 65082. Second Dist., Div. Three. Aug. 11, 1983.]

In re SUSAN HOLMES on Habeas Corpus.

SUSAN HOLMES, Petitioner, v.
THE SUPERIOR COURT OF SANTA BARBARA COUNTY,
Respondent;
COUNTY OF SANTA BARBARA, Real Party in Interest.

**COUNSEL**

Edwin S. Saul for Petitioner.

Kenneth L. Nelson, County Counsel, and John M. Cohan, Deputy County Counsel, for Respondent.

No appearance for Real Party in Interest.

---

**OPINION**

**LUI, J.—**

*Summary*

After a hearing by the court, Attorney Susan Holmes (petitioner) was found in contempt of court for assisting her husband Gerald[1] in attempting to avoid service of a subpoena. She was sentenced to eight hours in custody and a $500 fine. She seeks review of the contempt proceedings below by way of her petition for writ of habeas corpus or, in the alternative, for a writ of certiorari.

Petitioner attacks the proceedings below on several grounds. The principal ground of attack questions whether a person who knowingly assists another person in evading service of process is acting unlawfully, and thereby in a manner that is within the acts or omissions constituting contempt set forth in Code of Civil Procedure section 1209, subdivision 8.[2] We conclude that petitioner's actions were unlawful and that in the future any such actions would constitute contempt as a violation of the foregoing section. Although we find petitioner's conduct unlawful under this section, we have determined that this decision should not be applied retrospectively since this issue is "of first impression whose resolution was not clearly foreshadowed." (*Chevron Oil Co.* v. *Huson* (1971) 404 U.S. 97, 106 [30 L.Ed.2d 296, 306, 92 S.Ct. 349].)

---

[1]While Susan Holmes' petition was pending in this court, her husband Gerald's petition for writ of habeas corpus or in the alternative for a writ of certiorari seeking review of his fine of $500 and sentence of eight hours in the Santa Barbara County jail was also pending in Division Four of this district. Gerald had been found in contempt by the Santa Barbara County Superior Court for violation of section 1209, subdivision 9, of the Code of Civil Procedure (disobedience of a subpoena duly served) arising out of the same general factual incidents involved in this petition. Division Four denied his petition on October 29, 1982. On December 15, 1982, the Supreme Court denied his petition for a hearing.

[2]Subdivision 8 of Code of Civil Procedure section 1209 provides as follows: "The following acts or omissions in respect to a court of justice, or proceedings therein, are contempts of the authority of the court: . . . 8. *Any other unlawful interference with the process or proceedings of a court*; . . ." (Italics added, now renumbered 1209, subd. (a)8.)

Hereinafter, all references shall be to the Code of Civil Procedure unless otherwise indicated.

## *Facts*[3]

Jeffrey Ingram, an associate in the law firm of McGahan and Engel in Ventura, contacted Gerald in April or the summer of 1981 regarding Gerald's testifying as an expert in the trial of Mizuki v. Black and Decker, Inc. (Mizuki trial). Subsequent to the deposition of Gerald by opposing counsel, a trial date was assigned for October 1981. On or approximately September 15 or 18, Ingram made numerous telephone calls to Gerald's home and to petitioner's law office, leaving messages, but receiving no reply. He subsequently learned that Gerald was not in the state but that he worked at Magic Mountain. He attempted to call Gerald at Magic Mountain but received no reply from Gerald or petitioner.

Ingram's employer, James McGahan, advised Ingram that he had made contact with Gerald and that Ingram was to inform Gerald of the travel and lodging arrangements for his testimony. On Tuesday, October 6, Ingram called Gerald. Gerald indicated that he would not be available to testify that week and denied making any arrangements with McGahan. Gerald said that he had conflicting appointments. After Ingram explained the urgency of Gerald's testimony, Gerald said, "[t]hat's tough" or something similar.

Ingram then mentioned the possibility of a subpoena and the fact that Gerald's employer might like that better. When he asked if Gerald would mind the subpoena, Gerald replied "[l]ike hell I would." It was obvious to Ingram that Gerald did not wish to testify.

Ingram then arranged for an attorney service to serve a subpoena for Gerald's appearance in court October 8 at 10 a.m. Gerald never appeared on that date pursuant to the subpoena.

Acting on the instructions of Ingram, process server Walter Speth went to the Holmes' residence in Camarillo on October 6, at about 5:15 p.m. to serve Gerald. He saw a man in the driveway, identified in court as Gerald, and said "[h]i Jerry." Gerald replied, "I'm not Jerry." During this conversation, petitioner and a child were in the car in the driveway. Speth indicated that a person with normal hearing could have heard the conversation from within the car since the car door was open.

At Gerald's suggestion, Speth tried the doorbell to see if anyone was home. There was no response, so Speth left the driveway. He then saw Gerald enter the car which then drove off and returned a half hour later with only petitioner and the child inside.

---

[3]The facts relate to the testimony of witnesses at petitioner's contempt hearing on February 11, 1982.

Later, Speth rang the bell several times. Petitioner came to the door to ask what he wanted. He said that he had a check for Gerald; petitioner said that he was not feeling well. She wanted to know what the check was for and information about the papers, but he said that he was unable to discuss it with her. At Speth's request, she went back in the house to see if Gerald would come out. When she returned, she said Gerald was asleep and she did not wish to disturb him because he was not feeling well. She asked if he could give her the papers and check. Speth thinks that he finally told her that it was a subpoena.[4] She asked if he would give it to her since he had made such a diligent effort. She told him that he would have to come back in the morning.

At about 10 p.m., the sheriffs arrived. They advised Speth to leave since the neighbors were getting nervous. Speth went home.

Fevolde, the owner of the attorney service for whom Speth worked, and Speth were at Holmes' residence at 4 a.m. on October 7. Petitioner came out a little after daybreak and wiped the windows of a Chevy Blazer, which was parked in the driveway. She was dressed very casually, returned to the house, and came back out to the car about 10 to 15 minutes later. She backed out of the driveway, drove around the corner of the house and stopped. Fevolde saw Gerald run behind the house, hop a fence, go through trees or bushes, and get into the car petitioner was driving.

Speth and Fevolde blocked the Chevy Blazer with their vehicle. Fevolde got out of the car, ran over, placed the subpoena with a witness fee check on the windshield, and said in a very loud voice, "Gerald Holmes, you have been served."

Petitioner then put the car in reverse and drove around Speth's vehicle. The papers blew off the car. Later, petitioner got out of the vehicle and said, walking towards her residence "[y]ou served the wrong person . . . ." Gerald then gunned the car and went through a red light.

Patty Jo McGahan, McGahan's daughter-in-law and a secretary at his law firm, received a telephone call on October 7, at about 11 a.m., from a person identifying herself as Susan Holmes. The caller told Patty that she had been harassed by two men asking for Gerald and that she had called the police. She said that the man had put a paper on her windshield that morning and that the firm might want to cancel the check since it had blown off her window. She further said that the man in the vehicle was not her husband and that service had not been effected. She told Patty that she was an attor-

---

[4]In his previous testimony, Speth did not state that he told her it was a subpoena.

ney and would call the clerk's office in Santa Maria, report what had happened and indicate that Gerald had not been served.

### The Contempt Proceedings Below

On October 7, 1981,[5] the Mizuki trial was in progress in the Santa Barbara Superior Court, Santa Maria branch. McGahan, attorney for plaintiff Mizuki, told the trial court that he was having a problem with his expert witness, Gerald. McGahan requested a continuance or a mistrial, representing to the court that on October 5, 1981, Gerald had unequivocally said that he could and would be available to testify on Thursday, October 8. McGahan then represented to the court that he asked his associate to prepare a subpoena for Gerald and related the events of October 6 and 7, outlined above, particularly the petitioner's interference in the service of a subpoena on Gerald. McGahan represented to the court that Gerald had been served. The court denied McGahan's request for a continuance or a mistrial and decided to continue with jury selection.

On October 8, the court phoned and ordered petitioner to be present at 10 a.m. Neither Gerald nor petitioner were in court at 10 a.m. McGahan, Ingram, the two process servers, and Patty all testified on this date confirming in more detail the representations that McGahan had made to the court regarding the incidents with Gerald and petitioner. The court issued a bench warrant for Gerald and stated that the Ventura Sheriff had been unable to serve the order on petitioner that she appear by 10 a.m.

The court set a hearing for October 30 on an order to show cause why petitioner should not be held in contempt of court for "interference with the court's orderly business and aiding her husband to evade service of process which has substantially caused delay in [the Mizuki] trial." The court noted that it appeared petitioner called and said she would be in court at 1:30 p.m. At 1:40 p.m., petitioner called and said that she would be in court at about 2 p.m. Finally, the court released the jury until November 17, 1981.

Petitioner appeared in court later that afternoon and stated that she was making a special appearance for her husband and that she was unaware anyone was looking for her. She described her version of the alleged service of subpoena. The court did not put her under oath but ordered her to come back October 30, "to show cause why she should not be held in contempt" and explained what had happened so far including the bench warrant for

---

[5]Petitioner received a copy of the reporter's transcript of the Mizuki trial proceeding of October 7 and 8, 1981, as part of the notice of her contempt hearing.

Gerald. The court then stated "[i]f that is your husband, then I intend to hold hearings as to whether or not you should be held in contempt for your interference in helping a witness avoid process, you being an officer of the court, so that's the status of where we are at the present time. . . ."

Later, the court asked the bailiff to serve an order on petitioner, "to be present on the 30th of October at 1:30 in the afternoon to show cause why you should not be held in contempt, and also a copy of an order to your husband to be here." The court also ordered the reporter to transcribe the proceedings, stating that testimony was taken in lieu of an affidavit and that it would send a copy of its transcript to the petitioner. Based on petitioner's assertion that the person served was not her husband, the court said that it would allow a lineup but that petitioner must produce it.

Petitioner's first attorney filed an answer to allegations re contempt on October 28, 1981. The answer concedes that petitioner was an attorney and that Gerald was at all times acting under petitioner's direction as an attorney.

The hearing on petitioner's order to show cause re contempt was originally set for November 6, 1981, but was continued several times until it was heard by a judge who neither presided over the Mizuki trial nor decided Gerald's contempt citation. During these continuances, petitioner had three different attorneys representing her.

On February 11, 1982, the trial court denied a motion to discharge the contempt matter and testimony was taken. Petitioner did not present evidence. After argument, the court found beyond a reasonable doubt that petitioner had violated section 1209, subdivision 8, and that she was in contempt and had "interfered unlawfully, . . . with the process of the proceedings of the court." The court continued the matter for sentencing.

Edwin S. Saul, petitioner's fourth attorney, filed a first amended motion to discharge the contempt. The principal issue he raised was whether an unsuccessful attempt to avoid service of a subpoena is "unlawful" under section 1209, subdivision 8. Subsequently, on March 22, 1982, the court denied the motion to discharge the contempt and imposed the sentence previously indicated from which petitioner seeks review.

*Issue*

Petitioner's contentions on appeal are numerous. However, in view of our grant of her petition, we need only address the issue of whether her conduct was unlawful under section 1209, subdivision 8.

---

## Discussion

### *Petitioner's Acts in Assisting Her Husband to Evade Service of a Subpoena Were Unlawful Under Section 1209, Subdivision 8*

██ Petitioner's principal contention is that a person for whom a subpoena is issued is not acting unlawfully if he or she seeks to evade the service of that subpoena, and a person who may assist that person or act in concert with such person is similarly not acting in a contemptuous manner under section 1209, subdivision 8.

██ We initially note that contempt judgments are final, conclusive, and not appealable. (§§ 1222 and 904.1.) Therefore, courts have found that writ proceedings are appropriate vehicles for review of contempt orders. (*In re Coleman* (1974) 12 Cal.3d 568, 572, fn. 2 [116 Cal.Rptr. 381, 526 P.2d 533]; *Lister* v. *Superior Court* (1979) 98 Cal.App.3d 64, 69 [159 Cal.Rptr. 281]; *Hawk* v. *Superior Court* (1974) 42 Cal.App.3d 108, 115, fn. 3 [116 Cal.Rptr. 713].)

"In reviewing an adjudication of contempt, 'the sole question before us is one of jurisdiction of the trial court to render the judgment under review, and in such a case the review of the evidence is limited to determining whether there was any substantial evidence to sustain the jurisdiction of the trial court.' [Citations.] [In such cases, the Supreme Court has stated] 'the responsibility of the reviewing court is merely to ascertain whether there was sufficient evidence before the trial court to sustain the judgment and order. The power to weigh the evidence rests with the trial court.' [Citations.]" (*In re Buckley* (1973) 10 Cal.3d 237, 247 [110 Cal.Rptr. 121, 514 P.2d 1201, 68 A.L.R.3d 248].)

██ Substantial evidence supports the trial court's findings that petitioner, a member of the California Bar, knowingly and intentionally assisted her husband in attempting to evade service of a subpoena that compelled him to testify as an expert witness in a civil case. Petitioner does not contend that her actions did not cause interference with the process or proceedings of a court (see *Lister* v. *Superior Court, supra,* 98 Cal.App.3d 64), although she does later contend any interference caused minimal and not substantial delay in the Mizuki trial.[6]

---

[6]The conduct of petitioner and her husband did cause substantial disruption of the Mizuki trial. Much time was spent by the trial court and counsel regarding the prospective nonappearance by the expert witness, thereby delaying trial proceedings. In addition, petitioner appeared late on the date she was purportedly coming to quash the service of subpoena on her husband. Those hours can also be considered as delays in the proceedings.

Petitioner does, however, claim that her conduct is not "unlawful" within the meaning of section 1209, subdivision 8. Black's Law Dictionary (5th ed. 1979) page 1377, defines unlawful as "[t]hat which is contrary to, prohibited, or unauthorized by law. That which is not lawful. The acting contrary to, or in defiance of the law; disobeying or disregarding the law. While necessarily not implying the element of criminality, it is broad enough to include it."

The Legislature has made it clear that disobedience to a subpoena may be punished as a contempt. (Pen. Code, §§ 1331, 1331.5; Code Civ. Proc., § 1991 et seq.) Furthermore, our Supreme Court in *People* v. *Carpenter* (1902) 136 Cal. 391, 393 [68 P. 1027], found that a person who advised a witness, prior to trial, to conceal himself for the purpose of avoiding the service of a subpoena was guilty of Penal Code section 136, which at that time provided: "Every person who willfully prevents or dissuades any person who is or may become a witness, from attending upon any trial, proceeding, or inquiry, authorized by law, is guilty of a misdemeanor." (Deering's Pen. Code (1941) § 136, p. 35.) Penal Code section 136 has since been repealed, but Penal Code section 136.1, subdivision (a), provides in pertinent part: "[E]very person who knowingly and maliciously prevents or dissuades or attempts to so prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law is guilty of a misdemeanor." The slight differences in language between the 1902 statute and the more recent one enacted in 1980 would not seemingly change the interpretation of the statute by our Supreme Court in *Carpenter, supra.* Advising a witness to conceal himself for the purpose of avoiding service of a subpoena is in violation of Penal Code section 136.1 and therefore is "unlawful."[7]

Petitioner does not quarrel with the notion that present Penal Code section 136.1 makes it a crime to try to dissuade a witness from testifying. However, she claims that there is nothing that would give rise to the inference that she sought to dissuade her husband from testifying at the Mizuki trial. We disagree. The trial court could find, and indeed did find, that petitioner and her husband were not on an early morning drive to see the sights of their neighborhood when she drove out of her driveway and he ran through the back yard, jumped a fence and scurried through some bushes to reach

---

[7]*Broderick* v. *Genesee Circuit Judge* (1900) 125 Mich. 274 [84 N.W. 129], relied upon by petitioner for the proposition that one who conceals himself from service of a subpoena is not guilty of contempt under a Michigan statute similar to section 1209, subdivision 8, also states that the person detaining a witness or inducing a witness "to absent himself from the jurisdiction of the court" would be guilty of a crime similar to Penal Code section 136.1. (*Id.,* 84 N.W. at p. 130.) (See also *Falloon* v. *Superior Court* (1926) 79 Cal.App. 149, 156 [248 P. 1057], quoting from *In re Rice* (C.C.M.D. Ala. 1910) 181 F. 217.)

her vehicle. We believe the trial court's finding that she was flagrantly assisting an attempt to avoid service of a subpoena is entirely merited by the facts included in the record. A further inference is that the reason petitioner and Gerald were attempting to avoid service of the subpoena on Gerald was so that Gerald would not have to testify in the Mizuki trial; this inference is rational, logical, and supported by substantial evidence.[8]

There is some question about whether Gerald was, strictly speaking, a "witness" as that term is currently used in Penal Code section 136.1. Penal Code section 136 defines "witness," as used in that chapter, as follows: " 'Witness' means any natural person, (i) having knowledge of the existence or nonexistence of facts relating to any crime, or (ii) whose declaration under oath is received or has been received as evidence for any purpose, or (iii) who has reported any crime to any peace officer, prosecutor, probation or parole officer, correctional officer or judicial officer, or (iv) who has been served with a subpoena issued under the authority of any court in the state, or of any other state or of the United States, or (v) who would be believed by any reasonable person to be an individual described in subparagraphs (i) to (iv), inclusive." Code of Civil Procedure section 1878 defines "witness" in a manner almost identical to subdivision (ii).

While Gerald might not meet the strict definition, we believe his status was one that would subject a person aiding him in evading his subpoena to a finding of contempt under section 1209, subdivision 8. The ambiguity of his status under current statutory law, however, is one factor we have considered in deciding to make our decision in the case at bench prospective. Similarly, we believe the ambiguity of other statutes, such as Penal Code sections 166, subdivision 5[9] and 724,[10] in their application to the case at bench, justifies a prospective ruling.

---

[8]The Supreme Court in *Carpenter, supra,* 136 Cal. 391, does not make clear whether the predecessor of Penal Code section 136.1 distinguishes between those who help already recalcitrant witnesses and those who dissuade witnesses who are otherwise willing to receive a subpoena and testify. Neither has the Supreme Court subsequently reexamined whether the Legislature intended the act found a misdemeanor in *Carpenter* to be within the proscription of Penal Code section 136.1, subdivision (a). While the continued vitality of that part of the decision in *Carpenter* may be questioned, we are bound by it. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

[9]Penal Code section 166, subdivision 5, provides: "Every person guilty of any contempt of court, of either of the following kinds, is guilty of a misdemeanor: . . . 5. Resistance willfully offered by any person to the lawful order or process of any Court; . . ."

[10]Penal Code section 724 provides: "The officer must certify to the Court from which the process issued the names of the persons resisting, and their aiders and abettors, to the end that they may be proceeded against for their contempt of Court."

 Petitioner's conduct was an attempt to thwart or obstruct the administration of justice.[11] The court properly found that the conduct was unlawful under section 1209, subdivision 8.

### Disposition

We have been unable to find any decisional law in California which has dealt squarely with the question at hand—viz., whether a person is subject to contempt for knowingly and intentionally aiding another person to evade service of a subpoena by obstructing the service of the subpoena.[12] Consequently, such a question is one of first impression. Although we find that petitioner's conduct was outrageous and in fact impeded a trial in progress, we are persuaded to grant her petition solely because our opinion deals with a question of first impression whose resolution was not clearly foreshadowed. (*Chevron Oil Co.* v. *Huson* (1971) 404 U.S. 97, 106 [30 L.Ed.2d 296, 306, 92 S.Ct. 349].) Therefore, we hold that our decision should be given prospective and not retrospective effect. (See *Mitchell* v. *National Auto. & Casualty Ins. Co.* (1974) 38 Cal.App.3d 599, 604 [113 Cal.Rptr. 391].)

The superior court is directed to vacate its orders of February 11, 1982, and March 22, 1982, adjudging petitioner in contempt and pronouncing sentence in Santa Barbara Superior Court case no. SM 36135, entitled In re the Contempt of Susan Holmes, and to refrain from any further proceedings against petitioner for the acts discussed in this opinion.

Klein, P. J., concurred.

**DANIELSON, J.**—I respectfully dissent.

Although I agree with the analysis of this case as set forth in the majority opinion, I do not agree with the disposition. I would sustain the judgment

---

[11] "[I]t has been said that the power of a judge in contempt proceedings is not designed to protect his own dignity and person, but rather to protect the rights of litigants and the public by insuring that the administration of justice shall not be thwarted or obstructed." (*In re Bongfeldt* (1971) 22 Cal.App.3d 465, 475 [99 Cal.Rptr. 428].) "The enforcement of an order of contempt is for the maintenance of the dignity and authority of the court, and to preserve the peace and dignity of the People of the State of California. [Citation.]" (*Vaughn* v. *Municipal Court* (1967) 252 Cal.App.2d 348, 358-359 [60 Cal.Rptr. 575].) As the Supreme Court recently observed in *Vannier* v. *Superior Court* (1982) 32 Cal.3d 163, 171 [185 Cal.Rptr. 427, 650 P.2d 302]), "[a] judicial system with power to compel attendance of witnesses is essential to effective protection of the inalienable rights guaranteed by [art. I, § 1, of the Cal. Const.]."

[12] We do not attempt to set forth with any specificity the range of behavior in which obstruction of service can be accomplished so as to constitute contempt. Legislative clarification would be desirable.

of contempt, discharge the order to show cause, and deny the petition for the writ.

As the majority opinion has noted, in reviewing a judgment of contempt, the only questions before a reviewing court are whether the trial court has jurisdiction to render the judgment and whether there was sufficient evidence before the trial court to sustain the judgment and order. (Citing *In re Buckley* (1973) 10 Cal.3d 237, 247 [110 Cal.Rptr. 121, 514 P.2d 1201, 68 A.L.R.3d 248].)

The validity of the contempt judgment is the only matter subject to our review. We are not to be concerned with whatever lawful punishment the trial court has imposed.

It is not disputed that the trial court had jurisdiction to make the contempt judgment. And the majority has found, correctly, that substantial evidence supports the trial court's finding that petitioner's conduct was unlawful, in violation of section 1209, subdivision 8, in that she unlawfully interfered with the process or proceedings of the court. A violation of section 1209, subdivision 8 is, by its terms, contempt of the court. In the light of that determination, we should not annul the judgment.

The decision of the trial court was reached after a long and meticulous consideration of the case. The matter of the penalty to be imposed is uniquely within the discretion of the trial court acting, as here, within the limits of its statutory authority (Code Civ. Proc., § 1218). It is not the business of the reviewing court to substitute its judgment for that of the trial court as to the appropriateness of the penalty.

The disposition of this case under the majority opinion is an anomaly. It amounts to a declaration that petitioner's conduct was, indeed, an act of contempt, but that it will not be treated as a contempt in this case, though such conduct will be treated as contempt in the future. There has been no intervening change in the language of section 1209, subdivision 8. If such conduct will be treated as an act of contempt in the future, then most certainly it was an act of contempt when committed by petitioner.

The decision in this case need not depend solely upon whether petitioner's husband was a "witness," as that term is used in Penal Code section 136.1 and as it is defined in Penal Code section 136 and Code of Civil Procedure section 1878, though there can be no doubt that he was such a witness after he was served with the subpoena.

Nor need the decision turn upon whether there was sufficient evidence in the record to permit the inference that petitioner sought to dissuade her

husband from testifying at the Mizuki trial and that she thereby unlawfully interfered with the proceedings of a court.

At the conclusion of the contempt hearing, the trial judge stated: "THE COURT: Based on what I've heard and the violation, I have no doubt whatsoever in my mind and find beyond a reasonable doubt that the defendant in this case, Susan Holmes, was in violation of 1209(8) in that she acted or committed ommission [*sic*] and was in contempt, and that she interfered unlawfully, interfered with the process of [*sic*] the proceedings of the court. I have no doubt whatsoever in my mind about that, beyond all reasonable doubt, as far as I'm concerned."

The facts, which support the court's finding, include clear and substantial evidence that, apart from dissuading a witness from testifying, petitioner's conduct was an unlawful interference with the process of the court.

In this case a subpoena was served; a subpoena is "process" of a court; it is a writ or order of a court. (Code Civ. Proc., § 1985 and § 17, subd. (6); and see 2 Witkin, Cal. Procedure (2d ed. 1970) Actions, § 572, p. 1386.) It can be served by any person (§ 1987, subd. (a)). In the case at bench, it was being served by a process server.

Penal Code section 166 provides in part: "Every person guilty of any contempt of Court, of either of the following kinds, is guilty of a misdemeanor: [¶] 5. Resistance willfully offered by any person to the lawful order or process of any Court; . . ."

Also, a conspiracy by two or more persons "[t]o commit any crime . . . ." is itself the crime of conspiracy. (Pen. Code, § 182, subd. 1.)

After petitioner's husband was duly served with the subpoena issued by the court, petitioner drove off, causing the subpoena and check for witness fee and mileage to blow off the car. A few moments later, after leaving the car in which her husband sped off, she told the process server, in effect, "You served the wrong person." Later that morning petitioner telephoned the office of the attorney who caused the subpoena to be issued and informed that office that the man in the vehicle was not her husband and that service had not been effected. Petitioner's husband, the person subpoenaed, did not appear in court at the time or on the morning as ordered by the subpoena. There was substantial evidence before the trial court that his failure to appear was due, in whole or in part, to petitioner's willful resistance to the subpoena, which was the lawful order and process of the court.

The above described conduct of petitioner is clearly an interference with the process of the court. In addition to being unlawful conduct, within the

meaning of Penal Code section 136.1, subdivision (a), as reflected in the majority opinion, it is unlawful conduct in that it violates Penal Code sections 166, subdivision 5, and 182, subdivision 1, above.