[Crim. No. 10373. Third Dist. Nov. 19, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES TERRY McNEILL, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Gayle Guynup, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejuan, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Eddie T. Keller and Gary A. Binkerd, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

PUGLIA, P. J.—A jury found defendant guilty of murder in the second degree (Pen. Code, §§ 187, 189) and "ASSAULT WITH A DEADLY WEAPON AND BY MEANS OF FORCE LIKELY TO PRODUCE GREAT BODILY INJURY . . . ." (Pen. Code, § 245, subd. (a).) Firearm use was found as to each count. (Pen. Code, § 12022.5.) For reasons which follow, we shall affirm the conviction for murder and reverse the conviction for assault.

In their first encounter on the evening of December 21, 1978, defendant and Charles Muller, the murder victim, engaged in arm wrestling contests and exchanged argumentative words. Defendant offered and Muller agreed to rendezvous later that night to fight.

Defendant procured a .357 magnum revolver from his home. From there he drove to the home of a friend. The friend was not at home but defendant displayed the gun to his friend's roommate and told him that he had fought with some high school boys and was going back to "get 'em." Defendant telephoned another friend and told him that he had an argument with three high school boys and that he wanted the friend to watch two of them while he fought the third. The friend declined the invitation.

In the meantime, the victim Muller had driven to the rendezvous point, arriving at about 11 p.m.; four of his friends had come to watch the fight. About a half-hour later defendant arrived in his truck. He was alone. While his friends remained at a distance, Muller walked over and talked briefly to defendant and then returned to his friends. After waiting a short period for defendant's "friends" to arrive, Muller again

walked toward defendant's truck. Defendant got out of his truck and walked a few paces toward Muller. Muller's hands were in his pockets. The two halted at a distance of four to eight feet from each other. Defendant said, "It looks like they're not coming, doesn't it?" Thereupon defendant pulled the gun from his jacket pocket, raised it and fired a shot into Muller's forehead. Defendant then fired a series of rapid shots in the direction of the victim's four friends. As they took cover defendant sped away in his truck. Muller's friends, uninjured, ran to where he lay prostrate on the ground. His hands were still in his pockets. He died later that night of the gunshot wound.

Defendant went home from the encounter, changed his clothes, cleaned his gun and placed it in a kitchen drawer and hid a box of ammunition in a laundry basket. Defendant knew about paraffin tests and he washed his hands with an abrasive cleanser to remove any powder residue. He also asked his wife, if questioned by the police, to corroborate his story that he had gotten home about 9 p.m. and had remained there the rest of the night.

The following day the friend who had declined to accompany defendant to the affray asked defendant if he had kept the rendezvous; defendant denied that he had. Defendant was arrested that night, December 22, 1978.

### FELONY ASSAULT

Count II of the information charges "ASSAULT WITH A DEADLY WEAPON AND BY MEANS OF FORCE LIKELY TO PRODUCE GREAT BODILY INJURY...." Each of the victim's four companions who were with him at the murder scene is alleged to be a victim of the assault so charged.

■ Assaults upon separate victims, even though perpetrated by a single individual during an indivisible course of conduct, each comprise a separate, punishable offense. (*People v. Majors* (1884) 65 Cal. 138, 146 [3 P. 597]; see also *Neal v. State of California* (1960) 55 Cal.2d 11, 20-21 [9 Cal.Rptr. 607, 357 P.2d 839]; *People v. Miller* (1977) 18 Cal.3d 873, 885 [135 Cal.Rptr. 654, 558 P.2d 552].) The accusatory pleading was thus defective in alleging multiple offenses in one count (Pen. Code, § 954; all statutory references hereinafter are to sections of the Penal Code unless otherwise indicated). The defect constituted grounds to demur (§ 1004, subd. 3). However, by failing to demur, de-

fendant waived objection to the defect (§ 1012; see also *People v. Johnson* (1963) 223 Cal.App.2d 511, 513 [35 Cal.Rptr. 883]).

Unfortunately, the ramifications of this all too common error extend beyond mere formal insufficiency of the pleading, a problem susceptible of easy solution in any event. This particular pleading blunder invariably creates complicated instructional problems which if not resolved at trial frequently compel reversal. Obviously, the surest and simplest way to avoid the problem and its likely consequences is by proper pleading in the first instance.

The prosecutor attempted to clarify the confusions engendered by the improper pleading. At the People's request, the jury was specially instructed:

"It is not necessary in order to find the defendant guilty of ASSAULT WITH A DEADLY WEAPON OR BY MEANS OF FORCE LIKELY TO INFLICT GREAT BODILY INJURY, as alleged in Count II of the Information, that the defendant committed these acts against each of the four individuals named therein. It is sufficient if you find that defendant committed these acts on only one of the named individuals."

The special instruction was proper as far as it went. However, it did not go far enough. The jurors were not instructed that at minimum they must unanimously agree as to a single individual among those alleged in count II as victims upon whom an assault was committed. (See, e.g., CALJIC No. 17.01.) As defendant points out, under the special instruction given the jurors could have differed in their individual verdicts as to the identity of the victim of the assault.

It is fundamental that a criminal conviction requires a unanimous jury verdict (Cal. Const., art. I, § 16; *People v. Wheeler* (1978) 22 Cal.3d 258, 265 [148 Cal.Rptr. 890, 583 P.2d 748]). ■ Where defendant is charged in a single count with several offenses and the evidence tends to show that he committed more than one such offense, the jury must agree upon the particular act committed in order to convict. (See *People v. Scofield* (1928) 203 Cal. 703, 710 [265 P. 914].) The possibility that the jurors may have come to different conclusions as to the identity of the assault victim vitiates the constitutionally required asurance of juror unanimity as to the assault convic-

tion. While it is of course possible that the jurors agreed unanimously as to a particular victim of the assault, such agreement would necessarily be fortuitous in the absence of a proper instruction. More to the point, on the record before us we have no way to "gauge the precise effect" (*People* v. *Gainer* (1977) 19 Cal.3d 835, 854 [139 Cal.Rptr. 861, 566 P.2d 997, 97 A.L.R.3d 73]) of the instructional lacuna upon the verdict actually rendered. Since we cannot say that the jurors agreed unanimously upon the act constituting the offense charged in count II, we have no assurance that a miscarriage of justice did not occur. Therefore, the judgment of conviction under the assault count must be reversed. (See *People* v. *Gainer, supra,* at p. 855.)

MURDER

A.   Preservation of Evidence.

In defense to the charge of murder defendant claimed accident. Defendant testified that he raised the gun so that Muller would retreat; instead Muller lunged forward and grabbed his wrist causing the gun to discharge accidentally. Defendant also testified that on December 23, the day following his arrest, he noticed a scratch on his left forearm which he concluded must have been inflicted by Muller.

■ Relying on *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361], and cognate authorities, defendant contends that he was deprived of a fair trial because the prosecution omitted to take fingernail scrapings from the victim thus failing to preserve crucial evidence which would allegedly corroborate his testimony that the victim grabbed the gun causing it to discharge.

The victim died early in the morning of December 22. His body was released to the coroner at 7 a.m. the same day and an autopsy was performed that morning. The victim's family was understandably in shock; they expressed a desire to complete the funeral before Christmas. In accord with their wishes, on the afternoon of December 22, after completion of the autopsy, the body was released by the coroner to a funeral home designated by the victim's family.

Defendant was arrested the night of December 22 and interviewed by police shortly before midnight. Defendant did not claim any injuries.

Photographs of defendant's arms showing tatoos were taken for identification purposes when defendant was booked. Officers observed nothing unusual about his arms at that time.

Funeral services were held for the victim in the early afternoon of December 23. Immediately thereafter the body was cremated. Although scrapings were never taken from the victim's fingernails, his hands and fingernails were examined for evidence both by officers and by the autopsy surgeon and nothing of significance was observed.

On January 5, 1979, two weeks after the murder, defendant's attorney caused photographs to be taken of defendant's left forearm purportedly depicting the scratch allegedly inflicted by the victim.

*People* v. *Hitch, supra,* held that law enforcement agencies which administer breath tests to determine a driver's blood alcohol content must preserve the chemical ampoules utilized in such tests in order to permit defendant to verify the validity of the test results; intentional but nonmalicious destruction of the ampoules will result in sanctions unless the prosecution can show that the agency established and in good faith attempted to adhere to systematic procedures to preserve the ampoules (*Hitch,* at pp. 652-653).

The present circumstances are qualitatively different from those in *Hitch.* "As reflected in our laws, our society extends more respect to a dead body than to other physical evidence. (See Health & Saf. Code, §§ 7052, 7115.)" (*People* v. *Vick* (1970) 11 Cal.App.3d 1058, 1064-1065 [90 Cal.Rptr. 236].) Unlike a corpse, most physical evidence is not in a state of decay and is susceptible to examination without "outrage to the emotional feelings of the living." (*Id.,* at p. 1064.)

Defendant emphasizes that the victim's body could have been preserved without embalming for at least 20 days in cold storage; he complains that notwithstanding, the body was released to the victim's family immediately after the autopsy and that law enforcement agents did not instruct that the body should not be cremated. Quite apart from its more ghoulish implications, defendant's criticism overlooks the fact that prosecutorial agencies have no right to custody of the remains of a deceased; therefore no duty of preservation arises. As noted in *Vick, supra,* Health and Safety Code section 7102 provides a right of custody in

homicide cases to the coroner and not to any other person or official (*Vick*, at p. 1065). After the autopsy or investigation is completed by the coroner, the right to control disposition of the remains of a deceased and the duty of interment devolve on the family of the deceased (Health & Saf. Code, § 7100; *Vick, supra,* at p. 1065). Although a "trial court has the discretion to allow discovery by a criminal defendant including the examination of a body in some circumstances," a court will not judicially legislate to require "a coroner retain possession of a body until a defendant requests permission to conduct his own autopsy examination. Due process does not compel such a ruling." (*Vick, supra,* at p. 1066.)

Even assuming a right in law enforcement officers to control disposition of the victim's remains, there is no showing that they should have appreciated potential value to defendant of fingernail scrapings from the victim. (See *Robinson* v. *Superior Court* (1978) 76 Cal.App.3d 968, 975-976 [143 Cal.Rptr. 328].) When interviewed by the police on December 22, defendant did not claim to have been injured on the arm in the fatal encounter; indeed eyewitnesses to the murder had reported that at the time defendant was wearing a jacket. Moreover, eyewitnesses had described the victim as having had his hands in his pockets and at a distance of four to eight feet from defendant when the fatal shot was fired. Furthermore the victim's hands and fingernails had been examined grossly for signs of bruising, powder burns or other evidence with negative results.

The instant case is thus less one of failure to preserve evidence than failure to gather and collect everything which, with fortuitous foresight, might prove useful to the defense. (*People* v. *Watson* (1977) 75 Cal. App.3d 384, 399 [142 Cal.Rptr. 134]; *People* v. *Miller* (1975) 52 Cal. App.3d 666, 670 [125 Cal.Rptr. 341].) As aptly put by the trial judge, "the people were not required to foresee everything the fertile mind of the defense counsel might wish to examine."

Finally we observe that the probative value of fingernail scrapings from the victim is highly speculative given the evidence of physical contact between defendant and the victim during the arm wrestling contests which shortly preceded the murder. The possibility the scratch regarded by defendant as so crucial could have occurred at this time renders such evidence equivocal at best.

B. Jury Instructions.

The jury was instructed that if, before the trial, defendant made false or misleading statements about the charge, or attempted to fabricate or suppress evidence, such evidence could be considered as showing consciousness of guilt. The instructions given were substantially identical to those embodied in CALJIC Nos. 2.03, 2.04 and 2.06 respectively. Defendant contends the instructions summarized above find no support in the evidence and should not have been given.

■ The court has a duty to refrain from instructing on principles of law which are irrelevant to the issues raised by the evidence and which have the effect of confusing the jury. (*People* v. *Satchell* (1971) 6 Cal.3d 28, 33, fn. 10 [9 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383]; *People* v. *Saddler* (1979) 24 Cal.3d 671, 681 [156 Cal.Rptr. 871, 597 P.2d 130].) However, there was no error in giving any of the foregoing three instructions.

There was evidence that the morning after the shooting, defendant falsely informed a friend that he had not gone to the rendezvous location the night before as he had indicated he would. Immediately after the shooting, defendant returned home; he asked his wife to corroborate his intended fabricated story that he was at home at the time of the shooting; he changed clothes, cleaned his gun and placed it in the kitchen drawer and hid a box of ammunition in a laundry basket; he also washed his hands with an abrasive cleanser to remove evidence of powder residue. The foregoing evidence justifies the three instructions on consciousness of guilt. The weight of such evidence was a matter for the jury which was properly instructed to that effect.

Defendant further contends the three instructions discussed above and the instruction on the significance of flight (CALJIC No. 2.52) should not have been given because these instructions on consciousness of guilt are irrelevant to prove specific intent; thus, the argument proceeds, even if the jury found in accordance with the instructions that defendant evinced a consciousness of guilt, the evidence from which the inference arises is of no assistance in differentiating among various kinds and degrees of unlawful homicide of which defendant could possibly have been found guilty and which are characterized by different mental elements. Moreover, defendant suggests, albeit somewhat tentatively and without authority, consciousness of guilt may be a natural

reaction to the perpetration even of a justifiable or excusable homicide. Defendant concludes therefore that instructions on consciousness of guilt should be given only if modified to limit jury consideration of such evidence to "defendant's involvement in the incident and not his specific state of mind."

■ Evidence of consciousness of guilt is relevant to rebut the defense of accident, raised here, and to identify the perpetrator of the act for which defendant is on trial. It was proper to charge the jury so as to guide its consideration of such evidence. The instructions so given did not impinge on the issue of specific intent or mislead the jury with respect thereto. If defendant desired further clarification of the instructions, it was his burden to request it of the court. (*People* v. *Martinez* (1978) 82 Cal.App.3d 1, 19 [147 Cal.Rptr. 208].)

Finally, defendant complains that the flight instruction given by the court (CALJIC No. 2.52) is not probative of consciousness of guilt. Penal Code section 1127c requires the court to give the instruction where, as here, there is evidence of flight. (See also *People* v. *Cannaday* (1972) 8 Cal.3d 379, 391 [105 Cal.Rptr. 129, 503 P.2d 585]; *People* v. *Williams* (1980) 101 Cal.App.3d 711, 719 [161 Cal.Rptr. 830]; *People* v. *Watson, supra*, 75 Cal.App.3d at p. 403.) Even were we free to do so, we would decline to ignore or discard a long standing judgment enshrined in legislative enactment and judicial decision in favor of an essentially speculative evaluation of the probative quality of evidence of flight.

C. Enhancement for Firearm Use.

■ We reject defendant's contention that the court erred in imposing a two-year firearm use enhancement on the murder term. Penal Code section 12022.5 mandates the imposition of such enhancement for any felony unless the firearm use is an element of the offense. *People* v. *Walker* (1976) 18 Cal.3d 232 [133 Cal.Rptr. 520, 555 P.2d 306] involved a natural life sentence from which the defendant could never be discharged prior to death. It is therefore inapposite in the instant circumstances where the sentence to which the enhancement applies is an indeterminate term of from 15 years to life for second degree murder. (*In re Jeanice D.* (1980) 28 Cal.3d 210 [168 Cal.Rptr. 455, 617 P.2d 1087].)

## DISPOSITION

The judgment of conviction for murder is affirmed; that for felony assault is reversed. In view of our disposition of the assault conviction, defendant's remaining contentions need not be addressed.[1]

Blease, J., and Carr, J., concurred.

On December 16, 1980, the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied January 21, 1981.

---

[1]Defendant claims entitlement to behavior and participation credits attributable to his presentence time in local custody. (*People* v. *Sage* (1980) 26 Cal.3d 498 [165 Cal. Rptr. 280, 611 P.2d 874].) With respect to a defendant who has been sentenced, the computation of such conduct credits is an administrative function to be performed by the Department of Corrections. (*People* v. *Sage, supra*; see also Cal. Dept. of Corrections, Admin. Bull. 80/11.)