[Civ. No. 22460. Third Dist. July 24, 1984.]

RELIABLE ENTERPRISES INC., et al., Petitioners, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

606

608

COUNSEL

Hecht, Diamond & Greenfield, Roger Jon Diamond and C. M. Starr II for Petitioners.

No appearance for Respondent.

John K. Van de Kamp, Attorney General, Daniel J. Kremer, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Eddie T. Keller, and W. Scott Thorpe, Deputy Attorneys General, for Real Party in Interest.

OPINION

SIMS, J.—Petitioners Reliable Enterprises, Inc. and Max Delgadillo, an officer of Reliable, were adjudged in contempt of court for eight violations of a preliminary injunction that restrained them from permitting or allowing lewd acts to occur on the premises of the Adult World Bookstore (Adult World). Petitioners were fined $8,000. We issued a writ of certiorari to review the proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

This is not the first time petitioners have been enjoined from allowing lewd acts on their premises. This action finds its roots in a preliminary injunction issued against petitioner in 1978 based on a complaint filed pursuant to the Red Light Abatement Act (Pen. Code, § 11225 et seq.) (Sacramento County Superior Court No. 275319). That injunction enjoined petitioners from "allowing the occurrence, continuance or recurrence of acts of lewdness or assignation upon the premises . . . known as the ADULT WORLD BOOKSTORE." That lawsuit was held in abeyance while one defendant in the case appealed the issuance of the preliminary injunction. In July 1980, we upheld that injunction in *People* v. *Adult World Bookstore* (1980) 108 Cal.App.3d 404 [166 Cal.Rptr. 519].

On April 23, 1982, the Sacramento County District Attorney's Office filed a new complaint (Sacramento County Superior Court No. 303062) praying for, inter alia, a new preliminary injunction under California Penal Code sections 11225 through 11235 and Business and Professions Code sections 17200 through 17208[1]. The district attorney dismissed the prior complaint (No. 275319) on July 15, 1982, in order to proceed with the instant case.

After reviewing numerous affidavits describing sordid details of sodomy, assignation, solicitation, oral copulation and other lewd acts occurring regularly on the premises of Adult World, Judge Lloyd A. Phillips, Jr. issued the injunction in this case on September 20, 1982, restraining petitioners "from engaging in or in any manner allowing or permitting directly or indirectly the occurrence, continuance or recurrence of acts of lewdness, assignation or prostitution."

On October 26, 1982, the district attorney by ex parte motion obtained an order to show cause why petitioners should not be held in contempt of court for violation of the preliminary injunction. Submitted in support of issuance of the order to show cause was an affidavit of officer Bob Gully which outlined in detail lewd acts he witnessed on the premises of Adult World on October 7, 1982. Another affidavit by Deputy District Attorney Terence Brown also alleged violations of the injunction on October 7.

A hearing on the alleged contempt was conducted before Judge Phillips. Testimony demonstrated the previous lewd and illegal activity had continued unabated since issuance of the injunction and nothing but a perfunctory effort had been made to curb the activity. Over objection, and without causing the initiating affidavits to be amended (see Code Civ. Proc., § 1211.5, subd. (b)), the trial court admitted testimony that petitioners had allowed lewd acts to occur at Adult World on November 24, 1982.

---

[1]Section 11225 of the Penal Code provides in part: "Every building or place used for the purpose of . . . lewdness, assignation, or prostitution, and every building or place upon which acts of . . . lewdness, assignation, or prostitution, are held or occur, is a nuisance which shall be enjoined, abated and prevented . . . whether it is a public or private nuisance."

Section 11226 of the Penal Code provides in part: "Whenever there is reason to believe that a nuisance as defined in this article is kept, maintained, or is in existence in any county, the *district attorney*, in the name of the people of the State of California, *must*, or any citizen of the State, resident within said county, in his own name may, *maintain an action in equity to abate and prevent the nuisance and to perpetually enjoin the person conducting or maintaining it, and the owner, lessee or agent of the building, or place, in or upon which the nuisance exists, from directly or indirectly maintaining or permitting it.*" (Italics added.)

Section 17200 et seq. of the Business and Professions Code defines unfair competition and provides jurisdiction and remedies, including orders and judgments similar in nature to those prescribed by Penal Code section 11226 above.

At the conclusion of the contempt hearing, Judge Phillips made an oral finding that defendant Reliable had not taken any reasonable steps to comply with the injunction. The court also filed a written order adjudging Reliable Enterprises, Inc., and its corporate officer, Max Delgadillo, in contempt and finding, inter alia, "each of the 8 acts of lewd behavior observed on October 7, 1982 and November 24, 1982 by Officer GULLY was the result of Defendants' *willful failure* to obey the preliminary injunction . . . .." (Italics added.) Five lewd acts occurred on October 7; three on November 24.

Petitioners then obtained from this court a writ of certiorari to review the contempt order. They contend the evidence was insufficient to support a finding the violation of the injunction was wilful, the injunction was unlawfully ambiguous, the affidavits in support of the order to show cause were inadequate to establish jurisdiction to adjudicate petitioners' contempt, and the trial court had no jurisdiction to fine them for eight acts of contempt.

We conclude petitioners were denied their constitutional rights to reasonable notice of the charges related to conduct on November 24 and we annul the three adjudications of contempt attributable to that conduct; we affirm the five adjudications of contempt attributable to conduct occurring on October 7.

## DISCUSSION

### I

Before addressing petitioners' specific contentions, we set forth some principles generally applicable to this proceeding:

Code of Civil Procedure section 1209, subdivision (a)5, provides that disobedience of any lawful judgment, order or process of the court constitutes a contempt of the authority of the court.

█ "Direct" contempt is that committed in the immediate view and presence of the court or of the judge in chambers; all other contempts, such as this one, which occur outside the presence of the court, are "indirect." (See *Nierenberg* v. *Superior Court* (1976) 59 Cal.App.3d 611, 616 [130 Cal.Rptr. 847].) A contempt is punishable by a fine not exceeding $1000 or by imprisonment not exceeding five days, or both. (Code Civ. Proc., § 1218.)

"California courts have recognized that corporations are proper criminal defendants. As early as 1907 a California court held that ' "Private corporations in respect to their liability for the acts of their agents or servants

stand before the law on the same footing as individuals." [Citation.]' (*People* v. *Palermo Land & Water Co.* (1907) 4 Cal.App.717, 721 [89 P. 723, 725] (hg. den. Mar. 28, 1907, as reported in 4 Cal.App. at p. 722); see generally, 17 Cal.Jur.3d § 39, and cases cited therein.)" (*Granite Construction Co.* v. *Superior Court* (1983) 149 Cal.App.3d 465, 467 [197 Cal.Rptr. 3].)

■ A private corporation may be adjudged in contempt for violation of an injunction. (*Golden Gate M. Co.* v. *Superior Ct.* (1884) 65 Cal. 187, 190 [3 P. 628].)

■ "Because of the penalties imposed, a proceeding to punish an accused for contempt is criminal in nature, and guilt must be established beyond a reasonable doubt. [Citation.] . . . The power to weigh evidence, however, rests exclusively with the trial court. [Citations.] Accordingly, it is well settled that our responsibility upon review is merely to ascertain whether there existed any substantial evidence to sustain the jurisdiction of the trial court. [Citations.]" (*In re Coleman* (1974) 12 Cal.3d 568, 572-573 [116 Cal.Rptr. 381, 526 P.2d 533], followed in *Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 913 [141 Cal.Rptr. 133, 569 P.2d 727].)

II

A

■ Petitioners contend the evidence did not support a finding of "wilful disobedience." We disagree.

■ An adjudication for indirect contempt requires that the record contain substantial evidence that the contemner wilfully and contemptuously refused to obey the order of the court. (*Oliver* v. *Superior Court* (1961) 197 Cal.App.2d 237, 240 [17 Cal.Rptr. 474].) However, intent to violate an order may be inferred from the circumstances. (*City of Vernon* v. *Superior Court* (1952) 38 Cal.2d 509, 518 [241 P.2d 243].)

■ The evidence adduced at the hearing demonstrates there was no change in the manner of doing business after the injunction was issued. Sergeant Bob Lyon testified he had been in Adult World 10 to 15 times since the injunction was issued and had seen lewd acts on the premises during each visit. All manner of lewd acts, including sodomy, masturbation, exhibitionism, assignation, prostitution, and oral and anal copulation continued on a daily basis in plain view of anyone walking down the aisles of the bookstore.

Sergeant Lyon also testified that, on each visit, he found open glory holes;[2] and he had never been on the premises where he did not see semen on the floor of almost every booth, and several times, he saw human feces, condoms, and underwear. According to Sergeant Lyon, no agent or employee of Reliable did anything to discourage the lewd conduct.

Petitioner Delgadillo himself testified he visited the premises of Adult World "every single day." Occasionally, Delgadillo would visit Adult World two or three times a day, and he would always visit the area of the store where the film booths were located. Delgadillo testified he had a printed sign prepared prohibiting loitering and lewd acts on the premises, but he said the signs were torn down and replaced in what he described as a "continuing process." However, Sergeant Lyon never saw the sign described by petitioner. Delgadillo also had three of his employees sign a memo explaining the terms of the injunction, but he apparently did nothing more to see to it that employees of the corporation would do anything to discourage lewd acts on the premises. For example, clerks were not required to visit the areas where lewd acts were occurring regularly.

Further evidence of petitioners' wilful disregard of the injunction is found in the testimony of Thomas E. Rutkowski, who worked as a clerk at Adult World between August and October 25, 1982. After issuance of the injunction, Rutkowski noticed semen constantly on the floor and males "cruising" regularly on the premises. Rutkowski also observed condoms, underwear and human feces on the floor of film viewing booths. Rutkowski complained to petitioner Delgadillo that semen was constantly on the floor of film viewing booths. However, Delgadillo took no action on Rutkowski's complaints and told him he would get back to him at a later date. Delgadillo never got back to Rutkowski to talk about the conditions.

During his 90 days as an employee of defendants, and while the injunction was in effect, Rutkowski saw the "glory holes" being boarded up on two occasions. On each occasion, the holes were closed for about two days and then were allowed to remain open. Rutkowski finally quit his job when he could no longer stand the conditions on the premises, on a day when he observed two males masturbating in a film booth.

Delgadillo's own testimony that he was on the premises every day, coupled with Rutkowski's testimony, demonstrates that petitioner Delgadillo, and therefore Reliable, had actual knowledge of numerous lewd acts occurring on the premises on a daily basis and that petitioners made only transparently token efforts to comply with the injunction.

---

[2] "Glory holes" are holes made in the walls of film-viewing booths to allow persons in contiguous booths to engage in usually anonymous sexual acts.

The record discloses wilful disobedience in repeated violations of the injunction. Substantial evidence supports the violations cited in the contempt order that occurred on October 7. (See *City of Vernon* v. *Superior Court, supra,* 38 Cal.2d at pp. 517-518.)

## B

Petitioners also contend the order of contempt was "fatally" defective because it assertedly failed to state facts upon which a finding of wilfulness was based.

In a case of *direct* contempt, the court must make an order reciting the facts constituting the contempt. (Code Civ. Proc., § 1211; *In re Smith* (1976) 65 Cal.App.3d 291, 297-298 [135 Cal.Rptr. 5].) However, in a case of *indirect* contempt, the court need not state evidentiary facts supporting an ultimate finding of wilful violation of an order. Such a finding will be upheld in a case of indirect contempt if it is supported by substantial evidence. (See *In re Morelli* (1970) 11 Cal.App.3d 819, 851 [91 Cal.Rptr. 72]; *People* v. *Superior Court (Loar)* (1972) 28 Cal.App.3d 600, 622, fn. 11 [104 Cal.Rptr. 876]; *In re Gould* (1961) 195 Cal.App.2d 172, 175 [15 Cal.Rptr. 326].) Here, the court made an appropriate ultimate finding that defendants' conduct was wilful.

Petitioners' reliance on *In re Ny* (1962) 201 Cal.App.2d 728 [20 Cal.Rptr. 114] is misplaced. There, the court adjudged the petitioner in contempt based upon an affidavit that asserted Mrs. Ny had violated a court order by refusing to deliver her children to their father, her ex-husband. (P. 731.) The court ruled that because Mrs. Ny had delivered the children to prospective adoptive parents, she did not have custody of the children; therefore, "a finding of ability to perform has no evidentiary support." (P. 732.) Here, the record contains ample evidentiary support for the trial court's ultimate finding of wilful violation of the injunction.

Finally, petitioners note that the order of contempt refers to Reliable and Delgadillo by name at the outset but later refers collectively to "defendants." Petitioners apparently contend the reference to "defendants" is ambiguous and voids the order. Since only two defendants are named in the order, the plural reference to "defendants" is clearly to Reliable and Delgadillo.

## III

 Petitioners also claim the preliminary injunction is fatally ambiguous in its use of the words "allowing or permitting." When the injunction

was issued, petitioners indicated on the record the injunction was "fair;" they first assert a claim of unfair ambiguity in their challenge to the contempt order.

■ Petitioners correctly cite the following rule: " 'To hold a person guilty of contempt for violating an injunction, the acts constituting the contempt must be clearly and specifically prohibited by the terms of the injunction. [Citations.] The party bound by an injunction must be able to determine from its terms what he may and may not do; he cannot be held guilty of contempt for violating an injunction that is uncertain or ambiguous (*Ibid.*), just as he may not be held guilty of violating a criminal statute that fails to give him adequate notice of the prohibited acts.' (*Brunton* v. *Superior Court* (1942) 20 Cal.2d 202, 205 [124 P.2d 831].)" (*Sorensen* v. *Superior Court* (1969) 269 Cal.App.2d 73, 78 [74 Cal.Rptr. 597].)

■ Citing *People* v. *Conness* (1906) 150 Cal. 114 [88 P. 821], petitioners then argue, "It would appear that the words 'allow' and 'permit' connotate assent on the part of Petitioners. . . . The Respondent seems to have announced a strict liability interpretation of these words to require prevention. Respondent could have required prevention explicitly in his September 20, 1982 order, but did not do so."

The premise of the argument is correct: *Conness* does stand for the proposition that the words "allow" and "permit" imply some sort of assent on the part of the actor to be charged with criminal conduct. (*Conness, supra,* 150 Cal. at p. 121.) The problem with petitioners' argument is that even if their proposed restrictive definition of "allowing or permitting" is adopted so that assent is a necessary ingredient, there is ample evidence on the record to show petitioners assented to the lewd conduct occurring on the premises.

As we have noted, substantial evidence shows petitioner Delgadillo had actual knowledge lewd acts were occurring daily in the area of the film viewing booths. According to Delgadillo, it was petitioners' practice to require patrons to purchase tokens from the cashier to gain admittance to the film booth area. Petitioners' actual knowledge of ongoing lewd conduct by patrons who paid money to petitioners, coupled with their inaction in light of this knowledge, constituted an "active wish," "willingness," or "something more than mere indifference" to the lewd conduct. (See *Conness, supra,* 150 Cal. at p. 121.)

■ Due process requires only that the law give sufficient warning so that citizens may conduct themselves so as to avoid that which is forbidden.

(*People* v. *Superior Court* (*Hartway*) (1977) 19 Cal.3d 338, 345 [138 Cal.Rptr. 66, 562 P.2d 1315].)

 Since petitioners' conduct violated even their proposed definition of "allowing or permitting," they may not complain of vagueness in the injunction. Petitioners "cannot complain of the vagueness of [the injunction] if the conduct with which they are charged falls clearly within its bounds." (*Bowland* v. *Municipal Court* (1976) 18 Cal.3d 479, 492 [134 Cal.Rptr. 630, 556 P.2d 1081]; see *Parker* v. *Levy* (1974) 417 U.S. 733, 759-760 [41 L.Ed.2d 439, 459-460, 94 S.Ct. 2547].)

IV

A

 Citing *In re Ny, supra,* 201 Cal.App.2d 728, petitioners contend the trial court had no jurisdiction to find them in contempt because the affidavits submitted in support of issuance of the order to show cause re contempt failed to state sufficient facts.[3] Petitioners first assert the trial court had no jurisdiction because the initiating affidavits[4] failed to state that petitioners had the ability to comply with the injunction or that any violation was wilful.

Code of Civil Procedure section 1211 provides in pertinent part, "When the contempt is not committed in the immediate view and presence of the court . . . an affidavit shall be presented to the court . . . of the facts constituting the contempt . . . ." The affidavit is like a complaint in a criminal case; it frames the issues and must charge facts which show a contempt has been committed. (*Freeman* v. *Superior Court* (1955) 44 Cal.2d 533, 536-537 [282 P.2d 857]; *Mery* v. *Superior Court* (1937) 9 Cal.2d 379, 380 [70 P.2d 932]; *In re Wood* (1924) 194 Cal. 49, 61 [227 P. 908]; *In re Gould, supra,* 195 Cal.App.2d at p. 175.)

Before 1970, California law provided that "the affidavit of facts forming the basis of judicial action must show upon its face a case of contempt; and

---

[3]*Ny* held: "The facts essential to establish jurisdiction in the contempt proceeding are: (1) the making of the order, (2) knowledge of the order, (3) ability of the accused to render compliance, and (4) willful disobedience of the order. It is also required that the accused be proceeded against under due process. [Citation.] [¶] It is well established in this state that the affidavit by which a contempt proceeding is instituted, in order to sufficiently support an adjudication of contempt, must state facts constituting the offense. Otherwise, the court is without jurisdiction. [Citations.] . . . All elements of charged contempt must be averred in affidavit of accuser and must be developed in the proofs. [Citation.]" (*In re Ny, supra,* 201 Cal.App.2d at p. 731.)

[4]For convenience we refer to initiating declarations under penalty of perjury as "affidavits." (See *In re Morelli, supra,* 11 Cal.App.3d at p. 830.)

if it does not, the court is wanting in jurisdiction, and the order of contempt is void and will be annulled on *certiorari*. [Citations.] In such a case, it is immaterial what may be shown to the court upon the hearing, or specified and found by the court in its decree adjudging the accused guilty of contempt. The proceedings are void *ab initio*."[5] (*Hutton* v. *Superior Court* (1905) 147 Cal. 156, 159 [81 P. 409]; see, e.g., *Phillips* v. *Superior Court* (1943) 22 Cal.2d 256, 258 [137 P.2d 838]; *In re Wood, supra,* 194 Cal. at pp. 60-61; *Frowley* v. *Superior Court* (1910) 158 Cal. 220, 222 [110 P. 817].)

In 1970, the Legislature enacted Code of Civil Procedure section 1211.5.[6] (Stats. 1970, ch. 1264, § 1, p. 2282.) The statute obviously represents the Legislature's desire that contempt proceedings be adjudicated and reviewed on the merits and that contempt judgments not be set aside because of technical defects in an initiating affidavit. (See *Mossman* v. *Superior Court* (1972) 22 Cal.App.3d 706, 710 [99 Cal.Rptr. 638] [under Code of Civil Procedure section 1211.5, defects in affidavit did not void contempt proceedings *ab initio*].) Thus, for example, subdivision (a) of section 1211.5 provides that if no objection is made to the sufficiency of an affidavit, subject

---

[5]This curious rule of *Hutton* that elevates form over substance is ultimately traceable to dicta in *Overend* v. *Superior Court* (1900) 131 Cal. 280 [63 P. 372], a case that reviewed orders of *direct* contempt arising out of a witness' refusal to answer questions at trial. There, without citation to authority or further explanation, the court for some reason volunteered: "It has been held by this court and other courts, with entire unanimity, that when the contempt is a constructive contempt, namely, committed without the presence of the court, the affidavit of facts forming the basis of judicial action must show upon its face a case of contempt; and, if it does not, then the court is wanting in jurisdiction, and the order of contempt is void." (P. 284.) Later cases simply repeated the dicta. (See authorities cited in text.)

[6]Code of Civil Procedure section 1211.5 provides: "At all stages of all proceedings, the affidavit or statement of facts, as the case may be, required by Section 1211 shall be construed, amended, and reviewed according to the following rules:

"(a) If no objection is made to the sufficiency of such affidavit or statement during the hearing on the charges contained therein, jurisdiction of the subject matter shall not depend on the averments of such affidavit or statement, but may be established by the facts found by the trial court to have been proved at such hearing, and the court shall cause the affidavit or statement to be amended to conform to proof.

"(b) The court may order or permit amendment of such affidavit or statement for any defect of insufficiency at any stage of the proceedings, and the trial of the person accused of contempt shall continue as if the affidavit or statement had been originally filed as amended, unless substantial rights of such person accused would be prejudiced thereby, in which event a reasonable postponement, not longer than the ends of justice require, may be granted.

"(c) No such affidavit or statement is insufficient, nor can the trial, order, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form which does not prejudice a substantial right of the person accused on the merits. No order or judgment of conviction of contempt shall be set aside, nor new trial granted, for any error as to any matter of pleading in such affidavit or statement, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

matter jurisdiction "may be established by the facts found by the trial court to have been proved at [the] hearing . . . ." Petitioners made no objection in the trial court to the initiating affidavits on the grounds asserted above. We conclude the facts found by the trial court establish jurisdiction. (See *In re Bongfeldt* (1971) 22 Cal.App.3d 465, 477 [99 Cal.Rptr. 428].)

It is true subdivision (a) of Code of Civil Procedure section 1211.5 requires the trial court to "cause the affidavit . . . to be amended to conform to proof" and the trial court did not do so here. However, that omission did not "prejudice a substantial right of the person accused on the merits." (Code Civ. Proc., § 1211.5, subd. (c).) Subdivision (c) of Code of Civil Procedure section 1211.5 provides in pertinent part, "No . . . judgment of conviction of contempt shall be set aside . . . for any error as to any matter of pleading in such affidavit . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (See fn. 6, *ante*.) The failure of initiating affidavits to state a wilful violation of petitioners' ability to comply did not constitute a miscarriage of justice.

B

Petitioners also argue that only lewd acts that occurred on October 7, 1982, were referred to in the affidavits whereas, over objection, the People were allowed to present evidence of lewd acts that occurred on the premises on November 24, 1982,[7] the Wednesday preceding the hearing. The affidavits were not amended, as required by subdivision (b) of Code of Civil Procedure section 1211.5. (See fn. 6, *ante*.)

Regrettably, we conclude the failure to amend the affidavits was not simply a technical error of form but rather prejudiced substantial rights of petitioners.

The record, which is set forth in the margin,[8] shows the People did not offer evidence of acts on November 24 for the purpose of obtaining con-

---

[7]The People also presented evidence of lewd acts that occurred on October 28, 1982, but no objection was made nor were petitioners adjudged in contempt for conduct on that date.

[8]Officer Gully was questioned by Deputy District Attorney Terence Brown as follows:
"Q. Okay. Since October and today, have you been into Adult World?
"A. Yes, sir.
"Q. When were you into Adult World between October 7th and today?
"A. Last Wednesday.
"Q. Okay, and—
"MR. STARR [Counsel for the accused.]: Your Honor, I would like to object. The notice in regard to this contempt proceeding didn't say anything about activities last Wednesday.
"MR. BROWN: Counsel's assertion is correct. That was brought to my attention this morn-

tempt convictions for conduct on that date. Rather, the prosecution explicitly disavowed that the evidence was offered for that purpose. Yet the court's remarks suggest the evidence was being admitted for the purpose of establishing additional contempts.[9] (See fn. 8, *ante.*) This ambiguity between the purpose for which the evidence was offered and the purpose for which it was apparently admitted was not resolved until the conclusion of the hearing when the court in fact held petitioners in contempt for allowing three lewd acts on November 24. Had the court followed the required statutory procedure of amending the affidavit (Code Civ. Proc., § 1211.5, subd. (b)), petitioners would have had clear notice they were being charged with additional contempts for conduct on November 24.[10]

■ Because indirect contempt proceedings are criminal in nature, an accused is entitled to constitutional guarantees of due process of law, including notice of the charges. (*Arthur* v. *Superior Court* (1965) 62 Cal.2d 404, 408-409 [42 Cal.Rptr. 441, 398 P.2d 777]; *Warner* v. *Superior Court* (1954) 126 Cal.App.2d 821, 825 [273 P.2d 89].) ■ "Due process of law requires that an accused be advised of the charges against him in order that he may have a reasonable opportunity to prepare and present his defense *and not be taken by surprise by evidence offered at his trial.* [Citations.]" (Italics added.) (*In re Hess* (1955) 45 Cal.2d 171, 175 [288 P.2d 5]; followed in *People* v. *Anderson* (1975) 15 Cal.3d 806, 809 [126 Cal.Rptr. 235, 543 P.2d 603].) While some American cases have departed from the rule that a sworn affidavit must be used to initiate indirect contempt proceedings, to our knowledge the cases have uniformly insisted the accused

---

ing, and I was unaware they were in. It seems to me, even though it's not directly addressed within the affidavit, by inference it is a question before the Court. One of the questions is whether this was an isolated incident. *We are not claiming the Court should hold Adult World of Mr. Delgadillo for separate incidents of contempt,* but whether or not they have—

"THE COURT: I think you can show—

"Mr. Brown: Pardon?

"THE COURT: I think you can show any incident. You are not limited to those specified in the affidavit. The motion is very clear that the Court issued a preliminary injunction stating as indicated, and that it was served, and that notwithstanding that injunction, they have continued, they have violated it and are continuing to violate it and permit acts of leudness [*sic*] on the premises. That's sufficient." (Italics added.)

[9]In its ruling, the trial court erroneously confused the function of the motion and the function of the affidavit; only the latter document serves the function of an accusatory pleading in a case of indirect contempt. (See *Freeman* v. *Superior Court, supra,* 44 Cal.2d at 536-537.) The People's ex parte motion is not even the functional equivalent of an accusatory pleading; the record contains no indication the ex parte motion was ever served on petitioners.

[10]Because the conduct of November 24 constituted distinctly new and different offenses, admission of the evidence cannot be treated as an immaterial variance from the October 7 acts specified in the affidavit. (See Witkin, Cal. Criminal Procedure (1963) Proceedings Before Trial, §§ 196-198, pp. 184-187.)

be presented with a writing setting forth the alleged contempt.[11] (See, e.g., *In re Morelli, supra,* 11 Cal.App.3d at pp. 828-829; *Ex Parte Winfree* (1953) 153 Tex. 12 [263 S.W.2d 154, 41 A.L.R.2d 1259]; *Sheets* v. *City of Hagerstown* (1954) 204 Md. 113] [102 A.2d 734]; *Hunter* v. *State* (1948) 251 Ala. 11 [37 So.2d 276]; *Roe* v. *Watson* (1921) 151 Ga. 365 [106 S.E. 907]; see generally Annot., Necessity of affidavit or sworn statement as foundation for constructive contempt (1955) 41 A.L.R.2d 1263.)

We do not reach the question whether, in a case of indirect contempt, an affidavit may be properly amended during trial to allege wholly new offenses that occurred after filing of the accusatory pleading (the affidavit). (But see *People* v. *Berkowitz* (1977) 68 Cal.App.3d Supp. 9 [137 Cal.Rptr. 313].) Due process requires that an accused be given reasonably clear notice of whether he is being charged with criminal conduct. Here, the failure to amend the affidavit resulted in prejudicial uncertainty as to the purpose for which the November 24 evidence was admitted. Because petitioners were not given reasonably clear notice of the charges relating to November 24, their constitutional rights to due process of law were violated under the Fifth and Fourteenth Amendments to the Constitution of the United States and article I, section 7, subdivision (a) of the California Constitution.

For present purposes, we assume arguendo the error is not per se reversible but is rather subject to the *Chapman* test of harmless error. (See *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; see generally *Connecticut* v. *Johnson* (1983) 460 U.S. 73, [74 L.Ed.2d 823, 103 S.Ct. 969].) Because the ambiguity in notice of the charges was not resolved until the conclusion of the hearing, we have no way to gauge the effect of defective notice on petitioners' ability to defend against the charges. (See *People* v. *McNeill* (1980) 112 Cal.App.3d 330, 336 [169 Cal.Rptr. 313].) We must therefore conclude the constitutional violations constitute a miscarriage of justice requiring annulment of the three contempt adjudications related to conduct on November 24. (See *In re Robert G.* (1982) 31 Cal.3d 437, 445 [182 Cal.Rptr. 644, 644 P.2d 837]; *People* v. *Lohbauer* (1981) 29 Cal.3d 364, 370, 373 [173 Cal.Rptr. 453, 627 P.2d 183]; *Chapman* v. *California, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at pp. 710-711]; Code Civ. Proc., § 1211.5, subd. (c).)

## V

### A

 Petitioners argue they may not be adjudged in contempt for each lewd act shown by the evidence to have occurred on a single day; rather,

[11]*Arthur* v. *Superior Court, supra,* 62 Cal.2d 404, is not to the contrary. The contempt was characterized by the court as indirect. (P. 409.)

petitioners contend that, at most, they can be adjudged of having committed one contempt per day. We conclude that, on these facts, petitioners are incorrect.

■ Contempt is a disobedience of court by acting in opposition to its authority, justice or dignity. (*Raskin* v. *Superior Court* (1934) 138 Cal.App. 668, 670 [33 P.2d 35].) ■ Every separate act of disobedience of an injunction is a separate contempt. (*Donovan* v. *Superior Court* (1952) 39 Cal.2d 848, 855 [250 P.2d 246]; *Golden Gate M. Co.* v. *Superior Ct.*, *supra*, 65 Cal. at p. 192; see generally *In re Stafford* (1958) 160 Cal.App.2d 110, 113 [324 P.2d 967], discussing cases.)

We believe the crucial question is whether separate adjudications of contempt were based upon separate insults to the authority of the court, not whether the insults happened to occur on the same or different days. (See 5 Witkin, Cal. Procedure (2d ed. 1971) Enforcement of Judgment, § 172, p. 3533.)

Case law has sanctioned the imposition of separate punishments for contempt where the contemner has engaged in separate insults to the authority of the court on the same day. Thus, for example, in *Hume* v. *Superior Court* (1941) 17 Cal.2d 506, at pages 515-517 [110 P.2d 669], our Supreme Court upheld an adjudication of two counts of contempt against an attorney who filed a contumacious amended complaint and a contumacious affidavit on the same day.

In *In re Coleman*, *supra*, 12 Cal.3d 568, the trial court, on August 24, 1972, issued a temporary restraining order enjoining a union and its members and agents from committing any acts of harassment or intimidation against those who continued to deal with a hospital. (P. 571.) The union's business agent, one Flagg, and the union were adjudged guilty of having committed 28 separate contempts between August 24, 1972, and September 15, 1972. (*Ibid.*) Flagg was found to have thrown ice and paint, to have spit on various hospital representatives, and to have "tailgated" the vehicle of a nonstriking nurse. (*Ibid.*) The Supreme Court refused to issue a writ of habeas corpus as to Flagg and the union.[12] Although the question of multiple contempts was not raised, simple mathematical calculation reveals that both the union and Flagg had to commit multiple contempts on some days in order to commit 28 contempts between August 24 and September 15.

---

[12]The court vacated the judgment of contempt with respect to other petitioners. (*Coleman*, *supra*, 12 Cal.3d at p. 574.)

Petitioners rely on *In re Keller* (1975) 49 Cal.App.3d 663 [123 Cal.Rptr. 223], where the court held the refusal of a witness to answer six separate questions constituted but one contempt. (See also *Yates* v. *United States* (1957) 355 U.S. 66 [2 L.Ed.2d 95, 78 S.Ct. 128]; *Ex parte Stice* (1886) 70 Cal. 51 [11 P. 459]; Annot., Power to base separate contempt prosecutions or punishments on successive refusals to respond to same or similar questions (1964) 94 A.L.R.2d 1246.) The rule of *Keller,* however, is premised on the peculiar unfairness inherent in allowing a questioner to pile contempt upon contempt by asking a series of questions within an area of inquiry about which the witness has already indicated an unwillingness to answer: "We should not leave it to counsel to devise questions that might stand up as separate contempts or permit the recalling of a witness several days running and finding each refusal to testify to be a separate contempt. These are mere devices to permit effective punishment and are unfitting to the dignity of the judicial process." (*In re Keller, supra,* 49 Cal.App.3d at p. 671; see also *United States* v. *Costello* (2d Cir. 1952) 198 F.2d 200, 204, cert. den. 344 U.S. 874 [97 L.Ed. 677, 73 S.Ct. 166].)

Here, unlike *Keller,* petitioners' contempts were not generated by the conduct of others, acting beyond petitioners' control. Contrary to petitioners' contention, they were not adjudged in contempt simply because numerous lewd acts involving others occurred on the premises of Adult World. Rather, they were held multiply in contempt because they took no reasonable steps to discourage lewd acts occurring regularly on the premises and observable by any reasonable person. Unlike a recalcitrant witness, petitioners were reasonably in control of the conduct on October 7 that led to their several adjudications of contempt. The recalcitrant witness cases are therefore inapposite.

## B

 By their citation to *In re Farr* (1976) 64 Cal.App.3d 605 [134 Cal.Rptr. 595], petitioners apparently contend punishment for more than one contempt per day is precluded by Penal Code section 654.[13] *Farr* is not precisely on point, because it held section 654's preclusion of multiple *prosecutions* applicable to contempt proceedings. (*Farr, supra,* at p. 613.) However, it is generally recognized that section 654's prohibition of multiple *punishments* applies to penal provisions found in codes other than the Penal Code. (See, e.g., *In re Adams* (1975) 14 Cal.3d 629, 633 [122

---

[13]Penal Code section 654 provides: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other."

Cal.Rptr. 73, 536 P.2d 473]; *In re Hayes* (1969) 70 Cal.2d 604, 605 [75 Cal.Rptr. 790, 451 P.2d 430]; 2 Witkin, Cal. Crimes (1963) § 948, p. 901.)

█ We therefore conclude Penal Code section 654's preclusion of multiple punishments applies to punishments for contempt under Code of Civil Procedure, section 1218. Regrettably, this conclusion plunges us into the dark waters of Penal Code section 654's prohibition on multiple punishments.

We believe two things may be said with certainty about this statutory ban on multiple punishments. █ One is that, "The purpose of this legislative protection against punishment for more than one violation arising out of an 'act or omission' is to insure that a defendant's punishment will be commensurate with his culpability. [Citation.]" (*People* v. *Perez* (1979) 23 Cal.3d 545, 550-551 [153 Cal.Rptr. 40, 591 P.2d 63].) The other is, "Because of the many differing circumstances wherein criminal conduct involving multiple violations may be deemed to arise out of an 'act or omission,' there can be no universal construction which directs the proper application of section 654 in every instance. [Citation.]" (*People* v. *Beamon* (1973) 8 Cal.3d 625, 636 [105 Cal.Rptr. 681, 504 P.2d 905].) Rather, each case must be determined upon its own facts. (*In re Adams, supra,* 14 Cal.3d at p. 633.)

We perceive two different tests for determining whether section 654 should apply to preclude multiple punishments in the circumstances of this case.

The first is the famous test of *Neal* v. *State of California* (1960) 55 Cal.2d 11, at page 19 [9 Cal.Rptr. 607, 357 P.2d 839]: "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one."[14]

The *Neal* test has not been without problems.[15] Later cases recognized a defendant could commit any number of separate horrid acts in pursuit of a

---

[14]*Neal* built upon the transaction test discussed in *People* v. *Brown* (1958) 49 Cal.2d 577 at page 591 [320 P.2d 5]. The *"Neal"* test is sometimes called the *"Brown-Neal"* test. (See, e.g., *People* v. *Spangler* (1980) 113 Cal.App.3d 1039, 1046 [170 Cal.Rptr. 406].)

[15]"The *Neal* doctrine is difficult to apply for the most obvious of reasons: nobody knows what it is. The subsequent cases have simply elaborated the confusion that existed in *Neal* itself. There are two primary sources of ambiguity. First, it has never been clear to what extent *Neal* abandoned the 'single act' formula. As a result, many of the cases have proceeded as if the only important question were the presence or absence of distinct criminal acts on the part of the defendant. Other cases have held or implied that it makes no difference how many distinct acts were involved, if they were all incident to a single intent and objec-

single objective, but a facial application of the *Neal* test would limit that defendant's punishment to the same punishment as would be imposed on a defendant who committed but one unlawful act. Some cases have responded by constricting the objective of the defendant as is appropriate to achieve a just measure of culpability.

Thus, for example, in *People* v. *Perez, supra,* 23 Cal.3d 545, defendant was convicted of multiple forcible sex crimes committed during a brutal 45-minute attack on the victim. (Pp. 548-549.) On an appeal by the People, defendant contended the trial court had properly stayed all but one sex-crime sentence under *Neal,* because defendant's intent and objective was to obtain sexual gratification. "We disagree," said the court. "Such an intent and objective is much too broad and amorphous to determine the applicability of section 654. Assertion of a sole intent and objective to achieve sexual gratification is akin to an assertion of a desire for wealth as the sole intent and objective in committing a series of separate thefts. To accept such a broad, overriding intent and objective to preclude punishment for otherwise clearly separate offenses would violate the statute's purpose to insure that a defendant's punishment will be commensurate with his culpability. [Citation.] It would reward the defendant who has the greater criminal ambition with a lesser punishment. [Citation.]" (*Perez, supra,* at p. 552; see *People* v. *Ratcliffe* (1981) 124 Cal.App.3d 808, 818-819 [177 Cal.Rptr. 627]; compare *In re Adams, supra,* 14 Cal.3d 629 [transportation of various kinds of illegal narcotics constituted but one unlawful act].)

A similar theme is found in *People* v. *Neder* (1971) 16 Cal.App.3d 846 [94 Cal.Rptr. 364], where defendant was convicted of three counts of forgery after having forged a signature on three credit-card purchase slips in connection with three separate purchases of merchandise in the same Sears store on the same day. Acknowledging, "it might be said that the offenses were incident to the fundamental objective of taking goods from Sears by use of the credit card and by forging the sales slips" (pp. 853-854), nonetheless the court found separate objectives because "we have three separate

tive. [¶] The second source of ambiguity is the 'single intent and objective' test itself. The California supreme court has never given a coherent explanation of what this concept means, except that it is clearly designed to prevent punishment for both a preparatory crime and for the completed crime which is its object. Whether it has any broader meaning is hard to say. The court has occasionally indicated that a series of distinct criminal acts that are part of some larger transaction may not be subjected to separate punishments, but at other times it has forcefully rejected any such idea. The court is understandably wary of expanding the 'single intent and objective' test, because the test has very little to do with any rational criterion that might govern the appropriate degree of punishment. A defendant who commits several crimes is not necessarily less culpable or less dangerous if all the crimes were intended to further a single ultimate purpose." (Johnson, *Multiple Punishment and Consecutive Sentences: Reflections on the Neal Doctrine* (1970) 58 Cal.L.Rev. 357, 377-378, fns. omitted.)

forgeries, each directed to the obtaining of different property and none playing a part in the accomplishment of the end of the others. We do not believe that section 654 should make it a matter of indifference whether defendants, on entering the Sears store with the intention to obtain goods fraudulently by means of forgery, carried out the intention one or three times. [Citation.]" (*Id.*, at p. 854; see also *People* v. *Richardson* (1978) 83 Cal.App.3d 853, 867-868 [148 Cal.Rptr. 120].)

We follow *Perez* and *Neder* here. The record before us shows patrons visited Adult World to participate in lewd acts there. It might be said petitioners' objective in allowing or permitting numerous lewd acts to occur on the premises each day was generally to make money from amounts charged patrons. Petitioners' objective is more accurately characterized, however, as the desire to maximize income from as many patrons as possible. That objective, in turn, means that petitioners' specific criminal objectives were to allow many separate lewd acts involving many different patrons to occur daily on the premises. ■ Whether petitioners maintained multiple criminal objectives is primarily a question of fact for the trial court, whose finding will be upheld on appeal if there is any substantial evidence to support it. (*People* v. *Goodall* (1982) 131 Cal.App.3d 129, 148 [182 Cal.Rptr. 243], and authorities cited therein.) ■ Here, substantial evidence supports the trial court's implied finding petitioners intended that each separate lewd act on October 7 occur, so that multiple punishment is not precluded by the *Neal* test.

A somewhat different test of impermissible multiple punishment was adopted in *People* v. *Bauer* (1969) 1 Cal.3d 368 [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398], certiorari denied 400 U.S. 927 [27 L.Ed.2d 187, 91 S.Ct. 190]. There defendant robbed three elderly ladies and stole their car to make his escape. He was sentenced for robbery and auto theft. However, the Supreme Court held he could not be multiply punished, because the crimes constituted "a course of conduct comprising an indivisible transaction." (P. 377; see *People* v. *Harris* (1984) 36 Cal.3d 36, 65 [201 Cal.Rptr. 782, 679 P.2d 433].)

Justice Kaus, then sitting on Division Five of the Second District Court of Appeal, wrote of *Bauer*: "In *Bauer* the Supreme Court stresses a far more objective test: does the evidence show multiple crimes which are part of 'a course of conduct comprising an indivisible transaction.' (*People* v. *Bauer, supra,* 1 Cal.3d at p. 377.) Granted that, even so, a record made for the purpose of proving the defendant guilty is still a poor vehicle for determining an entirely different issue, the 'indivisible transaction' test at least gets away from speculative inquiries into defendant's overall objectives. Furthermore, the 'intent and objective' test appears to place a pre-

mium on 'thinking big' when planning a crime wave, a perverse notion which we should not attribute to the Legislature." (*People* v. *Venegas* (1970) 10 Cal.App.3d 814, 827-828 [89 Cal.Rptr. 103], conc. opn. of Kaus, J., fn. omitted.)

By the so-called "objective test" we conclude petitioners' conduct was not part of an indivisible transaction. The lewd acts themselves were committed by different people. None was necessary to the commission of any other. (Compare *People* v. *Harris, supra,* 36 Cal.3d at p. 65.) Each participating patron presumably paid money to petitioners. (See *People* v. *Neder, supra,* 16 Cal.App.3d at pp. 854-855.) Petitioners could have allowed one lewd act or a hundred. Their allowance of multiple acts was in no sense an "indivisible" transaction."

Having worked through the *Neal* and *Bauer* tests, we confess we find them relatively unhelpful. Presumably, the tests were designed to aid lower courts by setting forth guidelines for the application of Penal Code section 654. Yet we question whether these abstract tests of "subjective" intent or "objective" "indivisibility" of a "transaction" serve their purpose. For the most part, the cases manipulate the tests to arrive at a suitable level of culpability and consequent punishment. The tests are like the gluttonous butler: designed to help but often a burden.

We believe any uncertainty in application of the *Neal* and *Bauer* tests is best resolved by a return to basic principles of culpability. If, for example, we ask, "Who is deserving of the greater punishment, the citizen who violates an injunction by allowing a lewd act or the citizen who violates it by allowing five separate lewd acts?"[16] we suggest the obvious answer is the citizen who allows five lewd acts, because he has caused more harm to the public good. (See, e.g., *People* v. *Ramos* (1982) 30 Cal.3d 553, 589 [180 Cal.Rptr. 266, 639 P.2d 908]; *People* v. *Perez, supra,* 23 Cal.3d at p. 553; *People* v. *Miller* (1977) 18 Cal.3d 873, 885 [135 Cal.Rptr. 654, 558 P.2d 552].)

Petitioners' punishment for five counts of contempt is not precluded by Penal Code section 654.

### C

▮▮▮ Petitioner Delgadillo apparently contends he cannot be adjudged multiply in contempt, because he had no actual knowledge of the lewd acts that occurred on October 7.

---

[16]This characterization is charitable to petitioners. We did not assume the citizen violated the injunction eight times.

 However, where a defendant intends to cause criminal harm, "The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act." (1 Witkin, Cal. Crimes (1963) § 84, p. 82; compare *People* v. *Spring* (1984) 153 Cal.App.3d 1199 [200 Cal.Rptr. 849]; see generally Kenny, *Intention and Purpose in Law,* in Essays in Legal Philosophy (Summers edit. 1976) p. 146.) Thus in *People* v. *Gaither* (1959) 173 Cal.App.2d 662 [343 P.2d 799], defendant thoughtfully mailed a box of candy to his ex-wife at her address in Los Angeles. The candy consisted of four cute Easter bunnies and some peanut brittle. Defendant's ex-wife did not eat any candy. However, four people living in the house with her ate the candy and got sick, because the candy contained enough arsenic to kill 75 people. Two other people were also living in the house but did not eat the candy. (P. 666.) Since the evidence showed defendant wanted to cause harm and expected the candy might be eaten by seven people, he was properly convicted of seven counts of attempted poisoning. (Pp. 668, 672.)

 Here petitioner Delgadillo intended that lewd acts should occur on the premises. He knew numerous lewd acts were occurring each day, including October 7. It was therefore readily foreseeable that petitioner's failure to discourage the lewd conduct would result in the commission of at least five lewd acts on October 7.

Each separate lewd act wilfully allowed by petitioner constituted a separate violation of the injunction. Petitioner's culpability is not lessened simply because he did not know the precise number of lewd acts that occurred on the day in question. One who is subject to an injunction issued by the superior court cannot intend that multiple violations of the injunction occur and then escape full responsibility by claiming, like the proverbial monkey, that his eyes were shielded from the full extent of his wrong. The court is not so easily fooled.

DISPOSITION

The three judgments of contempt arising out of conduct on November 24, 1982, are annulled. The five judgments of contempt arising out of conduct on October 7, 1982, are affirmed. The writ is discharged.

Evans, J., concurred.

**REGAN, Acting P. J.** Concurring and Dissenting.—I concur in part and dissent in part. I would affirm all eight judgments of contempt, including the three arising out of conduct on November 24, 1982. The majority con-

cludes that the failure to amend the affidavits to conform to the testimony at the hearing alleging these three incidents substantially prejudiced the rights of petitioners. I disagree.

It is true the affidavits were not amended to conform to the proof admitted concerning three additional lewd acts on November 24, 1982, introduced as testimony at the hearing by Detective Gully. The trial court admitted proof of the additional evidence over objection. Although the affidavits were not amended, I do not think it is a fatal error. Code of Civil Procedure, section 1211.5, subdivision (c)[1], allows reversal only where an error results in a miscarriage of justice.

In assessing whether a miscarriage occurred, I would first note that the order to show cause, served on petitioners, charged that petitioners refused to obey the injunction, and, thus, they had notice to defend themselves. Petitioners cannot be surprised to have to defend themselves from evidence admitted in proof when (1) the order alleging disobedience of an injunction was served on petitioners September 21, with a hearing scheduled for November 29, and (2) petitioners did offer general denials that lewd acts *ever* occurred.

Furthermore, petitioners failed to counter the allegations concerning November 24 with any defense witness, testimony, legal theory or fact. I may infer that their offer of nothing more than a general denial regarding other incidents and other days means they had no specific defense to prepare for other incidents and other days. In fact, they did not preserve their objection to testimony for one of those days; they failed to move for a mistrial or for a continuance to prepare additional defense or to obtain witnesses. Petitioners now contend the failure to provide fair warning precluded an opportunity to prepare a defense, but they failed to take steps at the hearing to request any such opportunity. Finally, they have offered neither the trial court nor this court what that defense would have been.

Nor do I believe it is controlling here whether the People offered evidence of acts on November 24 for any purpose other than establishing additional contempts. There was no ambiguity between the purpose for which the evidence was offered and for which it was admitted: the trial court stated for the record, and quite correctly, that the court was not limited to considering the lewd incidents specified in the affidavit. The court made it per-

---

[1]Code of Civil Procedure section 1211.5, subdivision (c), provides in part: "(c) . . . *No order or judgment of conviction of contempt may be set aside,* nor new trial granted, for any error as to any matter of pleading in [the] affidavit or statement, *unless after an examination of the entire cause, including the evidence, the court shall be of the opinion* that the error complained of has resulted in a *miscarriage of justice."* (Italics added).

fectly clear all the incidents were to be used. Thus, there was no element of surprise. The only error is the court's failure to conform the affidavits to the proof adduced at trial. I believe that error did not prejudice any substantial right of petitioners.

I have examined the record of the entire cause, and the evidence admitted at the hearing provided overwhelming proof of their wilful disobedience of the injunction, all the time, day after day. They cannot be surprised at the hearing to have to defend themselves from allegations of violations on days other than the specific day noted in Gully's affidavit. No other conceivable result could have been forthcoming from this hearing than a contempt order for all eight violations. There was no miscarriage of justice.

I would affirm the contempt order.