Filed 7/1/14  P. v. Forrester CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C069239 |
| v. | (Super. Ct. No. SF114825A) |
| PATRICK JOHN FORRESTER, | |
| Defendant and Appellant. | |

Defendant Patrick John Forrester stabbed and killed Mark Baldwin.  A jury convicted defendant on one count of willful, deliberate, and premeditated murder and found that he personally used a knife in the commission of the crime.

Defendant now contends (1) the trial court erred in allowing the jury to decide which portion of an expert's testimony would be read back during deliberations; (2) there is insufficient evidence that defendant inflicted the fatal stab wound and thus perpetrated

1

deliberate and premeditated murder; and (3) the trial court failed in its sua sponte duty to instruct that an aider and abettor can be guilty of a lesser offense than the perpetrator.

We conclude (1) defendant forfeited his contention involving the readback of expert testimony because he did not raise it in the trial court; (2) sufficient evidence supports defendant's conviction as the perpetrator of willful, deliberate, and premeditated murder; and (3) defendant's claim of instructional error is forfeited, but it lacks merit in any event because the instructions, read together, made clear that the prosecution was required to establish defendant's individual culpability.

We will affirm the judgment.

## BACKGROUND

Mark Baldwin called 911 with his cell phone on the evening of April 27, 2010. He said "Patrick" just stabbed him and that Baldwin's "guts" were hanging out. Baldwin said Patrick was "Mexican," he was wearing a San Francisco Giants hat and black clothing, and he went toward Victory Park riding a pink bicycle. Baldwin told the 911 operator he had Patrick's phone number. He also said someone was driving by him and they were trying to kill him. Baldwin reported he was at Monte Diablo Avenue and Melbourne Avenue and people were about to jump him. Baldwin's 911 call lasted 3 minutes and 43 seconds.

About an hour before the 911 call, Baldwin was with defendant at Big Valley Food Market near the intersection of Monte Diablo Avenue and Buena Vista Avenue in Stockton. Surveillance video showed that defendant arrived at the market on a bicycle. Defendant wore a black jacket with a hood and what appeared to be a San Francisco Giants baseball cap. Baldwin bought two beers from the store.

Sione Tuakalua saw defendant with Baldwin in the area of Monte Diablo Avenue and Buena Vista Avenue sometime after 8:00 p.m., after Big Valley Food Market closed. Defendant wore a black jacket and a colorful baseball cap with different Giants logos on it. Tuakalua smelled alcohol on defendant's breath.

2

Tuakalua saw Baldwin take off on defendant's bicycle and then return. Tuakalua said Baldwin was acting strangely and appeared to be high. Defendant was angry. He told Baldwin, "Bring my fucking bike back" and grabbed the bicycle when Baldwin complied. Tuakalua saw defendant and Baldwin walk away together on Monte Diablo Avenue. He did not see any injuries on defendant or Baldwin.

Someone pounded on the front door of Mary Martinez Valle's house on Monte Diablo Avenue on the evening of April 27, 2010. Street lighting in the area was very dim. Valle heard something thrown against her house. She also heard someone call for help.[1] Valle's neighbor Robert Maldonado later saw a Caucasian man on the sidewalk yelling on his cell phone and pacing back and forth. Maldonado did not see anyone with the man.

Tresor Nzambi was with his girlfriend Tiffany Tolver at Shirleen Spivey's duplex on Monte Diablo Avenue when he heard his car alarm go off. Nzambi saw three or four people by his car. When Nzambi asked what the people were doing, the people ran away. One man walked slowly for a few feet and fell to the ground. He was holding his neck and bleeding.

Nzambi said one of the individuals who ran away returned and kicked the man who was on the ground in the head. Nzambi saw another person across the street. That person told the assailant to stop and to leave. But the assailant continued to kick the man on the ground.

Nzambi reported that the assailant wore a hat low on his head and a black hoodie. Nzambi described the assailant as about six feet tall and over 200 pounds. He told police

---

[1] Valle reportedly saw a white car stop. The car was a four-door and looked like a Chevrolet Monte Carlo. She saw the car door open and the car leave when sirens were heard. Valle said she did not see the people in the car, but she heard three male voices coming from the car. No other witness saw a car stop or a car door opening.

he may know the assailant. But Nzambi did not identify defendant in a photographic lineup as a person he saw on the night of the incident. He only said he recognized defendant from the neighborhood. Nzambi told police defendant may have been the assailant, but Nzambi was not certain.

Tolver saw two men fighting by Nzambi's car. She said they moved away from the car when Nzambi told them to get off his car. It appeared to Tolver that one of the men followed the other one. She heard someone across the street say "stop" and "don't do it." Tolver described the person across the street as short with curly hair. She later identified Lito Mendoza in a photographic lineup as the curly haired man. Mendoza was 5 feet 3 inches or 5 feet 4 inches tall with curly hair.

Tolver heard Mendoza say "Pat, man, leave." According to Tolver, the victim tried to get away. But the assailant followed the victim, stood behind him, and stabbed him in the neck. Tolver saw the assailant and the victim fall to the ground. She said the assailant "finished him right there." Tolver said the assailant's arm made a slicing or slashing movement and then the assailant ran away. Tolver did not see a knife.

Tolver initially denied recognizing anyone because she was afraid for her family's safety. She subsequently told police she saw the assailant's face and she identified defendant as the assailant. Tolver said she recognized the assailant by the clothes he wore. Tolver had previously seen defendant around the neighborhood and at Spivey's home. She said defendant wore the same clothes and baseball hat two days before the incident. She described the assailant's baseball hat as colorful and having colorful designs. She said the assailant wore a black sweatshirt with a hood.

Erica Skaggs, Thomas Lathan and Lana Meza were leaving Lathan's home on Monte Diablo Avenue when Skaggs and Meza saw a man lying on the street. Skaggs, Lathan and Meza saw two White or Hispanic men running from the scene. One wore a white shirt; the other wore a black top. They did not see the runners' faces. They gave varying descriptions of the runners' height and build.

4

Skaggs described the runners as thin and between 5 feet 3 inches and 5 feet 8 inches tall. She did not identify defendant in a photographic lineup.

Lathan told police the runners were 5 feet 8 inches tall and thin. But he described the people he saw differently at trial. He testified the person who wore a black hooded sweatshirt was 5 feet 8 inches tall and stocky; and the person who wore a white T-shirt was 5 feet 5 inches or 5 feet 6 inches tall and thin. Lathan did not recognize either man.

Meza said one of the runners was taller and bigger than the other. The taller runner wore a dark shirt. The other runner was smaller in frame, about 5 feet 7 inches tall, and wore a light colored shirt. Contrary to her trial testimony, Meza told police she saw two "little guys" running from the scene. Meza did not identify defendant during a photographic lineup.

Stockton police were on scene at about 8:46 p.m. Baldwin lay on the street, near Spivey's duplex. His cell phone was never recovered. Records for Baldwin's cell phone showed no calls were made from that phone after Baldwin's 911 call. Baldwin was taken to the hospital where he was pronounced dead.

Shortly after police arrived, Spivey's boyfriend John Burgess received a call from a man who wanted to know if anyone saw what happened. Defendant's cell phone records showed a call from defendant's cell phone to the cell phone Burgess used at 8:56 p.m. on April 27, 2010.

Two days after the stabbing, defendant had a bandage over his nose and cuts all over his face. He told his cousins he received his injuries when he was out with a friend and a man who bought him a beer at a liquor store. Defendant recounted that the man who bought him a beer said something like "Rule number one: I can take what I want." The man allegedly tried to take defendant's bicycle and maced defendant in the face. Defendant said his friend punched the man in the face. But the man pulled out a box-

cutter type knife and cut defendant on his nose.[2] Defendant claimed he pulled out a knife to defend himself. Defendant said he stabbed the man once with the knife, but did not say he killed the man. Defendant saw blood on his hands and shirt and went home and bleached his knife and shirt.

Defendant's cell phone records showed a series of calls were made between defendant's cell phone and Lito Mendoza's cell phone on April 27, 2010. Mendoza gave police different accounts of his involvement in the stabbing.

Mendoza at first denied any knowledge about what happened. He eventually admitted he was with defendant and Baldwin on the date of the stabbing. He said they were in the area of Monte Diablo Avenue and Buena Vista Avenue, near Big Valley Food Market. Mendoza said defendant was acting funny that day, saying things like "Lesson one and lesson two." Mendoza thought defendant was drunk. Mendoza claimed he went home because defendant was acting weird. He said Baldwin was not injured when he left.

Mendoza told police defendant called him repeatedly after Mendoza went home. Defendant told Mendoza Baldwin cut defendant across the face with a box cutter. Defendant said he was on Monte Diablo Avenue, near some duplexes. Mendoza lived about two blocks from the intersection of Monte Diablo Avenue and Melbourne Avenue. He reportedly went to defendant's location and saw defendant bleeding from a cut on his nose. Mendoza told police defendant "took it out of perspective and went after him again." Mendoza saw defendant and Baldwin wrestling and fighting on the sidewalk and then in the street. Mendoza said all of a sudden "blood started leaking out" from somewhere near the front of Baldwin's upper body. Mendoza recounted that Baldwin

---

[2] The day after the stabbing, Valle found a pocket knife behind the bushes by her front door. Two days later, she found a spray canister by a tree on the same side of the house where the knife was located. No blood was detected on the knife or the spray canister.

6

fell backward as blood squirted out of his upper body, defendant continued to hit Baldwin, and Baldwin was on the ground covering his face with his hands and calling for help. Mendoza denied stabbing Baldwin and claimed he did not see a knife. Mendoza said he left after he saw the blood.

At trial, Mendoza denied telling police he was with defendant and Baldwin on the day of the stabbing. Instead, Mendoza said he was walking home from his grandmother's house when he came upon defendant and Baldwin fighting on the sidewalk, near a car on Monte Diablo Avenue. At the preliminary hearing, Mendoza said he saw something, perhaps a knife, hit Baldwin in the neck area. But at trial, Mendoza said he did not see any weapons. Mendoza claimed not to remember many things at the trial.

However, Mendoza testified that Baldwin fell, called for help, and had his hands up to protect his face when defendant continued to hit Baldwin. Mendoza said he yelled from across the street for defendant to stop, saying "That's enough, Patrick, that's enough." According to Mendoza, defendant said something like "Fuck this, mother fucker, you ain't shit" while hitting Baldwin. Mendoza said blood was gushing out of Baldwin and defendant later acknowledged he had "messed up."

Detective Reynolds interviewed defendant one week after the stabbing. Defendant had a black eye, bruising around his left eye, and a cut on the bridge of his nose. Defendant told the detective he had been drinking and ran into a tree while riding his bicycle. He said he last saw Baldwin two or three weeks before. Defendant denied ever hanging out with Baldwin to drink beer and denied that he ever let Baldwin buy him beer. Defendant said he lost his Giants baseball cap.

Baldwin had five stab wounds and lost almost five liters of blood. He died as a result of a stab wound to his chest.

The wound to Baldwin's chest was delivered with significant force, such that it penetrated the chest wall, ribcage and sack surrounding the heart and cut Baldwin's aorta. A comprehensive analysis of that stab wound was not possible because the trauma

7

surgeon obliterated the entry wound when he cut through it.  Nevertheless, Dr. Bennet Omalu traced the path of the wound and determined it was roughly three inches deep.  Dr. Omalu concluded this was the only stab wound that would have produced a large amount of blood.  He said the stab wound to Baldwin's chest could have been inflicted by someone taller than Baldwin, standing behind Baldwin and stabbing Baldwin in the chest.  He also said the evidence was likewise consistent with the assailant standing by Baldwin's side when he stabbed Baldwin.

Baldwin had a second, nonfatal stab wound to his abdomen.  That wound was about three inches in depth, less than an inch in length, and less than a quarter of an inch in width.  Upon withdrawal of the knife used to stab Baldwin, the layer of fat over the intestines was pulled out of Baldwin's body.

There was a third stab wound above the second.  The third stab wound indicated that the assailant moved the knife after Baldwin was stabbed or Baldwin moved after being stabbed.  This wound was approximately two inches in depth, a little over an inch in length, and about one-third of an inch in width.  It did not penetrate any vital organ and was a nonfatal wound.  Dr. Omalu said Baldwin would still be able to walk around, scream for help, and make a phone call after suffering the stab wounds to his abdomen.

There was a nonfatal stab wound to Baldwin's right back.  That wound had a triangular configuration with a sharp edge and a blunt edge.  The wound was a little less than two inches in depth, less than one inch in length, and one-eighth of an inch in width.  Dr. Omalu said the wound was possibly inflicted while Baldwin was on the ground.

Stab wound number five was to Baldwin's left arm.  It could have been a defensive wound.  The wound was about two-and-a-third inches in length, about three-and-a-half inches in depth, and about half an inch in width.  Dr. Omalu said stab wound number five was consistent with someone trying to stab Baldwin as Baldwin was on his back and shielding his face with his arms and as the assailant squatted over Baldwin.

8

Baldwin had 20 blunt force traumas, abrasions and contusions to his face, along with defensive injuries. His fingernails did not show injury, indicating that he did not engage in significant one-on-one physical fighting.

Dr. Omalu concluded from Baldwin's 911 statements that Baldwin had sustained the stab wounds to his abdomen at the time of the 911 call, and he was subsequently stabbed in the chest. Defendant's pathology expert Dr. Terri Haddix agreed with this assessment.

Dr. Omalu opined the assailant was taller than Baldwin. Dr. Omalu said the nonstab wound injuries suggested the assailant was much bigger than Baldwin and easily overpowered him so that Baldwin simply took a defensive position.[3] Dr. Haddix disagreed with Dr. Omalu's opinion that the assailant was taller and bigger than Baldwin. She said the location and appearance of the wounds to Baldwin's chest, back and abdomen do not say anything about the size, height or strength of the assailant.

Dr. Omalu further opined, within a reasonable degree of medical certainty, that only one knife was used to inflict all five stab wounds because the wounds had a single edge and one blunt edge, and were all about the same depth. He said the knife used to stab Baldwin was a small knife, consistent with a blade of approximately four inches.

Dr. Haddix testified that a three- to five-inch knife could produce the stab wounds in this case but she disagreed that one knife was used to inflict all five stab wounds. She concluded more than one knife could have inflicted the wounds, and it could not be concluded that only one knife was used. Dr. Haddix said it was difficult to compare wound numbers one, three, and five with the other wounds, and the wounds did not have the same depths. She said it was extraordinarily common for a knife to have a sharp end

_____

[3] Defendant was about six feet tall and weighed over 200 pounds. Baldwin was 5 feet 7 inches tall and weighed about 130 to 135 pounds.

9

and a blunt end.  However, Dr. Haddix conceded that Dr. Omalu had more information about the case than she had.

Witnesses saw defendant with two different pocket knives with three- or four-inch blades two-to-five weeks before the stabbing.

The jury convicted defendant of the willful, deliberate and premeditated murder of Baldwin (Pen. Code, § 187, subd. (a) -- count one).[4]  In addition, the jury found true the allegation that defendant personally used a knife in the commission of the murder. (§ 12022, subd. (b)(1).)  The trial court sentenced defendant to 25 years to life in prison on count one, plus a one-year concurrent prison sentence for the section 12022 enhancement.

DISCUSSION

I

Defendant contends the trial court committed reversible error in allowing the jury to decide what portion of Dr. Omalu's trial testimony would be read back during deliberations.

A

The jury asked to review a copy of Dr. Omalu's testimony.  The trial judge discussed the jury's request with counsel outside the presence of the jury.  Defense counsel wanted Dr. Omalu's entire testimony read back because the jury did not specify a subject area they wished the readback to cover.  The prosecutor said the jury did not have to rehear the entire testimony, but proposed giving the jury a copy of the transcript for Dr. Omalu's entire trial testimony.  Defense counsel stated he had never given a jury a transcript, and he did not know the procedure.  The trial judge ruled it would have the

_____

[4] Undesignated statutory references are to the Penal Code.

10

court reporter read Dr. Omalu's testimony to the jury rather than provide the jury with a transcript.

After considering the question of what would be read back to the jury, the trial judge said the jurors could agree when they had heard enough and stop the readback. The trial judge instructed the jurors not to deliberate during the readback and not to ask the court reporter any questions or interrupt the readback. The trial judge also told the jurors they could look at exhibits during the readback. Defendant and defense counsel elected not to be present during the readback, but asked the trial judge to have the court reporter note where the readback ended. The trial judge subsequently informed the parties that the jury terminated the readback about halfway through the prosecution's direct examination of Dr. Omalu.

B

Defendant contends the trial judge should have decided what portion of Dr. Omalu's testimony would be read back to the jury. But defendant did not object on this ground in the trial court. Instead, he objected that the trial court should require the court reporter to read Dr. Omalu's entire testimony. Defendant's appellate claim is forfeited because he did not raise it in the trial court. (*People v. Robinson* (2005) 37 Cal.4th 592, 634.)

In any event, the claim lacks merit. Pursuant to section 1138, the jury has a right to rehear testimony on request during its deliberations.[5] (*People v. Ayala* (2000) 23 Cal.4th 225, 288 (*Ayala*).) The primary concern of section 1138 is the *jury's* right to

---

[5] Section 1138 provides, "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

11

rehear the evidence.  (*Ibid.*)  The defendant cannot compel the trial court to order the jury to listen to the rereading of a witness's entire testimony once the jury is satisfied it has heard enough.  (*Id.* at p. 289; *People v. Gordon* (1963) 222 Cal.App.2d 687, 689; *People v. Cathey* (1960) 186 Cal.App.2d 217, 221-222; *People v. Smith* (1906) 3 Cal.App. 62, 67-68.)  As the appellate court in *People v. Smith* said when it rejected the defendant's contention that his entire testimony should be read when the jury requested a readback:  "If the jury did not wish to hear it read the court was not required to compel them to listen to it.  It may be assumed that the portion of his testimony which they heard included all upon which they desired to have their memory refreshed."  (*People v. Smith, supra*, 3 Cal.App. at p. 68.)

Here, the trial court considered which portion of Dr. Omalu's testimony would be read to the jury.  The trial court's decision is consistent with the primary purpose of section 1138.  Because the jury had already heard the evidence, the trial court was not required to order the jury to listen to Dr. Omalu's entire testimony again if it did not want to do so.  (*Ayala, supra,* 23 Cal.4th at p. 289.)  There is no indication that the court reporter did not reread any testimony which the jury wished to hear.  Had the jury wanted further testimony read to them, or other further clarification, they would have made such a request because the jury subsequently asked to rehear other evidence.  (*People v. Gordon, supra*, 222 Cal.App.2d at p. 689.)

Defendant contends *Riley v. Deeds* (9th Cir. 1995) 56 F.3d 1117 (*Riley*) requires reversal here.  In that case the jury asked to rehear the victim's testimony at a time when the trial judge was not in the courthouse.  (*Id.* at p. 1119.)  Without consulting the judge, the judge's law clerk told the jury the court reporter would read the victim's testimony and the foreman should raise his hand when the jury heard enough.  (*Ibid.*)  The foreman raised his hand to terminate the readback at the conclusion of the victim's direct examination.  (*Ibid.*)  The Ninth Circuit held that the trial judge's absence and failure to exercise discretion regarding whether to permit the victim's testimony to be read back,

how much to read and whether other testimony should also be read resulted in structural error rendering defendant's trial fundamentally unfair. (*Id.* at pp. 1118, 1122.)

The Ninth Circuit subsequently acknowledged that the holding in *Riley* is limited to its particular facts. (*People v. Robinson, supra,* 37 Cal.4th at p. 636, fn. 21 [citing *United States v. Arnold* (9th Cir. 2001) 238 F.3d 1153, 1155].) And the circumstances of this case are different. As defendant concedes, the trial judge was present to receive the jury's readback request, she discussed the jury's request with counsel, and she was apparently available to address any questions that might have arisen during the readback. In addition, she exercised her discretion to allow the jury to hear only that portion of the testimony that the jury wanted read back. Unlike in *Riley*, there was no structural error here.

Defendant also fails to explain how any alleged lack of guidance by the trial court resulted in prejudice. As we discuss in the next section, there was evidence other than Dr. Omalu's testimony that established defendant's guilt. A conviction will not be reversed for a section 1138 violation unless the appellant demonstrates prejudice. (*People v. Robinson, supra*, 37 Cal.4th at p. 634; *People v. Box* (2000) 23 Cal.4th 1153, 1214, overruled on another ground in *People v. Martinez* (2010) 47 Cal.4th 911, 948, fn. 10; see generally *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 ["the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice"].)

## II

Defendant next claims there is insufficient evidence that he inflicted the fatal stab wound and thus perpetrated deliberate and premeditated murder.

In reviewing for sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether there is substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find that the defendant committed the charged offense

beyond a reasonable doubt.  (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.)  " '[W]e

" 'presume[ ] in support of the judgment the existence of every fact the trier could

reasonably deduce from the evidence.'  [Citation.]"  [Citations.]  "Conflicts and even

testimony which is subject to justifiable suspicion do not justify the reversal of a

judgment, for it is the exclusive province of the trial judge or jury to determine the

credibility of a witness and the truth or falsity of the facts upon which a determination

depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we

look for substantial evidence." ' "  (*People v. Harris* (2013) 57 Cal.4th 804, 849.)  The

standard of review is the same where the prosecution relied primarily on circumstantial

evidence.  (*Ibid.*)  If the circumstances reasonably justify the jury's findings, the fact that

the circumstances might also be reasonably reconciled with a contrary finding does not

warrant a reversal of the judgment.  (*Id.* at p. 850.)

Viewing the evidence in the light most favorable to the judgment, we conclude

sufficient evidence supports the count one conviction for willful, deliberate, and

premeditated murder under the theory that defendant was the perpetrator.  Tolver

identified defendant as the person who stabbed Baldwin.  She recognized defendant by

his colorful baseball cap and black hooded sweatshirt.  The surveillance video from Big

Valley Food Market, Tuakalua's testimony, and Baldwin's 911 statement concerning

defendant's attire on the evening of the stabbing bolster Tolver's identification.

Moreover, Tolver heard Mendoza refer to the assailant as "Pat."  Defendant's first

name is Patrick.  Mendoza testified he called out defendant's name as defendant attacked

Baldwin.

Defendant's motive to kill Baldwin provides circumstantial evidence that he was

the perpetrator.  (*People v. Mullen* (1953) 115 Cal.App.2d 340, 343 [antagonism between

the defendant and the victim is relevant to the issue of the defendant's identity as the

assailant]; *People v. Gonzales* (1948) 87 Cal.App.2d 867, 877-878 [motive to kill the

victim is relevant to the identity of the killer].)  Tuakalua said defendant was angry when

14

Baldwin took defendant's bicycle. Defendant told his cousins the victim tried to take defendant's bicycle, said "I can take what I want," cut defendant with a box cutter, and maced defendant in the face. Mendoza told police defendant accused Baldwin of cutting defendant across the face with a box cutter. Defendant reportedly said "[y]ou ain't shit" as he viciously attacked Baldwin. The jury could reasonably conclude that defendant was angry at Baldwin and wanted to retaliate against him.

There is also ample evidence of defendant's consciousness of guilt and purpose to avoid detection. Defendant ran from the scene, said he "messed up," called Burgess after fleeing the scene and asked if anyone saw what happened, and bleached the knife he used to stab Baldwin. He told his cousins one story about how he received his injuries and told police a different story. (*People v. Russell* (2010) 50 Cal.4th 1228, 1255 [jury could infer consciousness of guilt from the defendant's inconsistent statements]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1139-1140 [attempt to suppress evidence tends to prove a consciousness of guilt]; *People v. McNeill* (1980) 112 Cal.App.3d 330, 339 [evidence of defendant's conduct which included washing his hands with abrasive cleanser to remove any gunpowder residue justified consciousness of guilt instruction]; *People v. Kittrelle* (1951) 102 Cal.App.2d 149, 158 [defendant's false and inconsistent statements and flight may be considered as tending to prove a consciousness of guilt].)

Defendant argues there were four people fighting by Nzambi's car and someone other than defendant could have fatally stabbed Baldwin during the fight by the car. Nzambi said he saw three or four individuals by his car when he first looked outside, but Nzambi was admittedly concerned about Tolver and her baby and was not focused on what was happening in the street. Tolver and Mendoza, who provided more detailed descriptions, recalled a fight between two people. Tolver saw defendant stab Baldwin. Mendoza told police defendant and Baldwin were fighting when suddenly "blood started leaking out everywhere." The fatal stab wound would have produced a large amount of blood. In Tolver and Mendoza's accounts, defendant was the only person standing near

15

Baldwin. Defendant had a knife on the evening of the assault and the jury found defendant personally used a knife in the commission of the murder. The jury could reasonably infer from the evidence that defendant was the person who fatally stabbed Baldwin.

Defendant also argues there is insufficient evidence he aided and abetted a first degree murder. We do not address this contention because as we have explained, substantial evidence supports the jury's finding that defendant was the perpetrator.

### III

Defendant further contends the trial court prejudicially erred in failing to instruct the jury sua sponte that an aider and abettor can be guilty of a lesser offense than the perpetrator.

Defendant's trial counsel did not object to the trial court's jury instructions or request clarifying or amplifying instruction language in the trial court, and thus his claim of instructional error is forfeited. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163 [instructional error claim regarding aider and abettor liability forfeited by failure to request modification or clarification in the trial court].) Perhaps anticipating this problem, he argues in the alternative that his trial counsel was ineffective for failing to request such an instruction. We do not address this purported alternate contention, however, because defendant did not assert it under a separate heading in his opening brief. (See Cal. Rules of Court, rule 8.204(a)(1)(B); *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830, fn. 4 [an appellant must present each point separately in its opening brief under an appropriate heading, showing the nature of the question to be presented and the point to be made; failure to do so may be deemed a forfeiture of the argument].)

In any event, his claim of instructional error fails on the merits. In assessing a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable

16

likelihood the jury applied the instruction in an impermissible manner. (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.)

The trial court told the jury a person may be guilty of a crime in two ways: as a perpetrator or as an aider and abettor. An aider and abettor's guilt is determined by the combined acts of all the participants in the crime and the aider and abettor's mens rea. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1122.) " '[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295-296.)

Here, the trial court instructed, pursuant to CALCRIM No. 401, that to prove defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that the perpetrator committed the crime; defendant knew that the perpetrator intended to commit the crime; before or during the commission of the crime, defendant intended to aid and abet the perpetrator in committing the crime; and defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime. The trial court said the jury must find that defendant intentionally committed the prohibited act and possessed the specific intent set forth in the instruction for the crime. The jury was instructed on the requisite elements for murder and willful, deliberate and premeditated murder. The trial court also instructed the jury on provocation, sudden quarrel or heat of passion, self-defense and imperfect self-defense, specifying the requisite mental states for those doctrines.

It is true that in certain circumstances, an aider and abettor may be found guilty of a greater or lesser crime than the perpetrator. (*People v. McCoy, supra,* 25 Cal.4th at p. 1122; *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118.) But read together, the instructions given made clear the prosecution was required to establish defendant's

17

individual culpability, and the jury had to determine defendant's mens rea. The jury could not have reasonably understood the instructions to say that defendant's culpability was the same as that of the perpetrator in all cases, if the jury determined defendant was not the person who fatally stabbed Baldwin. We must assume that jurors are intelligent persons capable of understanding and correlating the jury instructions, and that they followed the trial court's instructions. (*People v. Richardson* (2008) 43 Cal.4th 959, 1028; *People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Unlike the cases defendant cites -- *People v. Loza* (2012) 207 Cal.App.4th 332, 348, *People v. Nero* (2010) 181 Cal.App.4th 504, 510, and *People v. Samaniego, supra,* 172 Cal.App.4th at pages 1162-1163 -- the trial court here used the current version of CALCRIM No. 400 which omits the "equally guilty" language some courts have found potentially misleading or erroneous. The earlier version of CALCRIM No. 400, and its equivalent CALJIC No. 3.00, provided that a person was equally guilty of the crime whether he committed it personally or aided and abetted the perpetrator who committed it. (*People v. Loza, supra,* 207 Cal.App.4th at p. 348 & fn. 8.) The trial court in this case did not give such an instruction. There is no indication the jury was confused about the aiding and abetting instructions. (Contrast *People v. Loza, supra*, 207 Cal.App.4th at pp. 354-355; *People v. Nero, supra*, 181 Cal.App.4th at p. 518.) None of the cases defendant cites impose an obligation to sua sponte instruct that an aider and abettor can

18

be guilty of a lesser offense than the perpetrator when the trial court instructs with current CALCRIM Nos. 400 and 401.

DISPOSITION

The judgment is affirmed.


                                                                                      MAURO            , J.


We concur:


_____BLEASE_____, Acting P. J.


_____MURRAY_____, J.